5 30
**FILED**

MAR 2 1 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

AO 241 (Rev. 5/85)

PETITION UNDER 28 USC § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | District | NORTHER DISTRICT OF CALIFORNIA |
|---|---|---|
| Name    Eric Charles Rodney K'nAPP | Prisoner No.    J-10618 | Case No. |

| Place of Confinement |
|---|
| Salinas Valley State Prison |
| Post Office Box 1050 |
| Soledad, California 93960-1050 |

CV 08 1573

JSW

| Name of Petitioner (include name under which convicted) | Name of Respondent (authorized person having custody of petitioner) |
|---|---|
| ERIC CHARLES RODNEY K'nAPP          V. | WARDEN, SALINAS VALLEY STATE PRISON |

| The Attorney General of the State of: |
|---|
| CALIFORNIA |

**(PR)**

## PETITION

1. Name and location of court which entered the judgment of conviction under attack  California Superior

Court in and for the County of Sacramento, Sacramento, California.

2. Date of judgment of conviction    August 30, 1993

3. Length of sentence    Ninety-eight (98) years (Aggregate)

4. Nature of offense involved (all counts)  Counts 1 & 2: Rape; Counts 3-5: Oral Copulation;

Counts 6-8: Digital Penetration; Count 10: Sexual Battery;

Count 11: Burglary; Count 12: Assault w/ Deadly Weapon;

Count13: Sexual Battery; Counts 14 & 15: Digital Penetration.

5. What was your plea? (Check one)
(a) Not guilty        ☒
(b) Guilty            ☐
(c) Nolo contendere   ☐
If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

_____

_____

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
(a) Jury        ☒
(b) Judge only  ☐

7. Did you testify at the trial?
Yes ☒   No ☐

8. Did you appeal from the judgment?
Yes ☒   No ☐

(2)

This form was electronically produced by John Etchells and Richard Jones using Omniform Internet Publisher.

AO 241 (Rev. 5/85)

---

9. If you did appeal, answer the following:

(a) Name of court    California Court of Appeal, Third Appellate District

(b) Result _____ Denied

(c) Date of result and citation, if known _____ October 6, 1995

(d) Grounds raised    (1) Trial court's failure to sever cases; (2) Improper jury instructions; (3) Forcing Petitioner to wear mask on witness stand. (See, Attachment 1, at page 39, lines 27-35.)

(e) If you sought further review of the decision on appeal by a higher state court, please answer the following:
(1) Name of Court _____ California Supreme Court

(2) Result _____ Denied

(3) Date of result and citation, if known _____ December 22, 1995

(4) Grounds raised    Improper jury instruction. (Attachment 1, at 39:38.)

(f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:
(1) Name of Court _____

(2) Result _____

(3) Date of result and citation, if known _____

(4) Grounds raised _____

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?
Yes ☒  No ☐

11. If your answer to 10 was "yes," give the following
(1) Name of Court    California Superior Court, Sacramento County

(2) Nature of proceeding    Petition for Writ of Habeas Corpus

(3) Grounds raised    Please see Attachment 1, p. 43, at G.

AO 241 (Rev. 5/85)

_____

(4) Did you receive an evidentiary hearing on your petition, application or motion?
  Yes ☐  No ☒

(5) Result _____ Denied _____

(6) Date of result _____ November 2001 _____

(b) As to any second petition, application or motion give the same information:

(1) Name of court   Please see Attachment 1 pp. 46-51, at I, J, M, and N.

(2) Nature of proceeding _____ Id. _____

(3) Grounds raised _____ Id. _____

_____

(4) Do You receive an evidentiary hearing on petition, application or motion?
  Yes ☒  No ☐

(5) Result _____ Denied _____

(6) Date of result     July 28, 2006 (see, Attachment 1, p. 50, at 3).

(c) Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?

(1) First petition, etc.     Yes ☒  No ☐ -- See, Attachment 1 pp. 46-51, at I, M, N
(2) Second petition,        Yes ☒  No ☐

(d) If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

_____

12. State *concisely* every ground on which you claim that you are being held unlawfully. Summarize *briefly the facts* supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting same.
  CAUTION: In order to Proceed in the federal court you must ordinarily first exhaust your available state court remedies as to each ground on which you request action by the federal court. If you fail to set forth all grounds in this petition, YOU may be barred from presenting additional grounds at a later date.

AO 241 (Rev. 5/85)

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief You may raise any grounds which you may have other than those listed if you have exhausted your state court remedies with respect to them. However, you *should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.
(b) Conviction obtained by use of coerced confession.
(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.
(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.
(e) Conviction obtained by a violation of the privilege against self-incrimination.
(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.
(g) Conviction obtained by a violation of the protection against double jeopardy.
(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.
(i) Denial of effective assistance of counsel.
(j) Denial of right of appeal.

A. Ground one:                Please see Attachment 1, at page 53.

Supporting FACTS (state *briefly* without citing cases or law)        Id.

B. Ground two:                Please see Attachment 1, at page 55.

Supporting FACTS (state *briefly* without citing cases or law):        Id.

(5)

AO 241 (Rev 5/85)

C. Ground three:                    Please see Attachment 1, at page 58.

Supporting FACTS (state *briefly* without citing cases or law):                    Id.

D. Grounds 4-6:    Please see Attachment 1, at pages 61, 64, and 65.

Supporting FACTS (state *briefly* without citing cases or law):                    Id.

13. If any of the grounds listed in 12 A, B, C and D were not previously presented in any other court, state or federal, state *briefly* what the grounds were not so presented, and give your reason for not presenting them: _____

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?
Yes ☐   No ☒

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:
(a) At preliminary hearing _____

(b) At arraignment and plea        Sacramento County Public Defender's Office

AO 241 (Rev. 5/85)

| (c) At trial | Dennis Owen Higgins |
| | Sacramento, California |
| (d) At sentencing | James T. Locke |
| | Sacramento, California |
| (e) On appeal | Ross Thomas |
| | San Francisco, California |
| (f) In any post-conviction proceeding | Richard Dangler |
| | Sacramento, California |
| (g) On appeal from any adverse ruling in a post-conviction proceeding | Marilee Marshall |
| | Los Angeles, California |

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
Yes ☒ No ☐   (See, Attachment 1, pp. 11-13 [at 1] and 35 [at (f)].)

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ☐ No ☒
future: _____

_____

(b) Give date and length of the above sentence: _____

_____

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ☐ No ☐

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct. Executed

_____
(date)

_____
Signature of Petitioner

(7)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ERIC CHARLES RODNEY K'nAPP,

Petitioner,

v.                                          Case No.: _____

Warden of Salinas Valley
    State Prison,

Respondent.
_____/

-oOo-

**Brief in Support of Petitioner's 28 U.S.C. § 2254 Form Petition**

-oOo-

Eric Charles Rodney K'nAPP (#J10618)
Salinas Valley State Prison
Post Office Box 1050
Soledad, California 93960-1050

In Propria Persona

Table of Contents

| | Page |
|---|---|
| I. INTRODUCTION | 2 |
| II. PROCEDURAL HISTORY | 3 |
| III. STATEMENT OF FACTS | 8 |
| A. Petitioner's history up to and including his arrest on 11/22/92 | 8 |
| B. People v. K'nAPP, CR118548, California Superior Court, Sacramento County | 11 |
|    1. Petitioner's charges | 11 |
|      (a) Information filed 11/24/92 | 11 |
|      (b) Information filed 12/23/92 | 12 |
|      (c) Information filed 2/22/93 | 13 |
|    2. Significant pretrial events | 13 |
|      (a) Prejudicial publicity | 13 |
|      (b) Undue influence causing prejudicial waiver of preliminary hearing | 13 |
|      (c) First Marsden motion for change of counsel | 14 |
|      (d) Plea negotiations | 14 |
|      (e) Lack of preparation by defense counsel | 15 |
|      (f) Second Marsden motion for change of counsel | 16 |
|      (g) Severance motion | 16 |
|    3. Significant events of trial | 16 |
|      (a) Prejudicial publicity | 17 |
|      (b) Petitioner's mother angers trial judge | 17 |
|      (c) Jury instructions before evidence | 18 |
|      (d) Testimony of Sara case | 18 |
|         Sara's | 19 |
|         Petitioner's | 21 |
|      (e) Testimony of Charlene case | 24 |
|         Charlene's | 24 |
|         Petitioner's | 25 |
|      (f) Performance of defense counsel | 25 |
|      (g) Excerpts from recorded visit conversations | 27 |
|      (h) Petitioner's forced wearing of "ski mask" during testimony | 27 |
|      (i) Emotional outburst of prejudicial information in court | 27 |
|      (j) Mistrial motions | 28 |
|      (k) Closing statements to jury | 30 |
|         By the prosecution | 30 |
|         By the defense | 31 |

4. Significant events after trial ........................... 32
   (a) Concluding instructions, case to jury .............. 32
   (b) Prejudicial publicity ............................. 33
   (c) Jury's verdict ................................... 33
   (d) Nonperformance of trial attorney ................. 33
   (e) Change of counsel for new trial motion, sentencing . 34
   (f) sentencing ...................................... 35
C. Direct appeal, C017988, California Court of Appeal, Third District . 39
D. Petitioner's first few years in prison ................... 40
   1. Initial events, circumstances, and conditions of confinement . 40
   2. Discovery of withheld exculpatory evidence ......... 41
   3. Hiring attorney for relief on habeas corpus ......... 42
E. Apprendi v. New Jersey (2000) 530 U.S. 466 ........... 43
F. Newly discovered evidence of IAC at sentencing ........ 43
G. 1st habeas petition, 01F08858, California Superior Court, Sacramento County . 43
H. Newly discovered evidence of innocence in Charlene case . 43
I. 2nd habeas petition, C044019, California Court of Appeal, Third District . 46
J. 3rd habeas petition, 03F09161, California Superior Court, Sacramento County . 47
K. Newly discovered evidence showing IAC, perjury by main prosecution witness . 47
L. Blakely v. Washington (2004) 542 U.S. 296 ........... 48
M. 4th habeas petition, C049875, California Court of Appeal, Third District . 49
   1. Order to show cause .............................. 49
   2. Evidentiary hearing .............................. 49
   3. Denial of relief in trial court .................... 50
   4. Return to appellate court ........................ 50
   5. Petition   for review ........................... 50
   6. Cunningham v. California (2007) 549 U.S. --- ....... 51
   7. Denial of petition for review .................... 51
N. Final state habeas petition, S156134, California Supreme Court . 51
IV. GROUNDS FOR RELIEF .................................. 53
    Ground 1: Newly discovered evidence of actual innocence, false testimony . 53
    Ground 2: Ineffective assistance of counsel ........... 55
    Ground 3: Prosecutorial misconduct .................. 58
    Ground 4: Jury Prejudice ........................... 61

Ground 5: Cumulative errors of the court(s) ......... 64

Ground 6: Unconstitutional punishment ......... 67

V. PRAYER FOR RELIEF ......... 69

VI. VERIFICATION ......... 70

Table of Cases

|  | Page(s) |
|---|---|
| Apprendi v. New Jersey (2000) 530 U.S. 466 | 43, 67 |
| Arizona v. Fulminante (1991) 499 U.S 304 | 64 |
| Arthur Andersen, LLP v. U.S. (2005) 544 U.S. 696 | 61, 64 |
| Benton v. Maryland (1969) 395 U.S. 784 | 67 |
| Berger v. U.S. (1935) 295 U.S. 78 | 58, 61 |
| Blakely v. Washington (2004) 542 U.S. 296 | 48, 67 |
| Brady v. Maryland (1963) 373 U.S. 83 | 55, 58, 61 |
| Brown v. Ohio (1977) 432 U.S. 161 | 67 |
| Carriger v. Stewart (9th Cir. 1997) 132 F.3d 463 | 69 |
| Chapman v. California (1967) 386 U.S. 18 | 53, 58, 64, 67 |
| Coleman v. Thompson (1991) 501 U.S. 722 | 69 |
| Crawford v. Washington (2004) 541 U.S. 36 | 55, 58, 61 |
| Cunningham v. California (2007) 126 S.Ct. 856 | 51, 67 |
| Darden v. Wainwright (1986) 477 U.S 168 | 58, 61, 64 |
| Davis v. Washington (2006) 126 S.Ct. 2266 | 58, 61 |
| Deck v. Missouri (2005) 125 S.Ct. 2007 | 61 |
| Douglas v. California (1963) 372 U.S. 353 | 55 |
| Doyle v. Ohio (1976) 426 U.S. 610 | 61, 64 |
| Dretke v. Haley (2004) 541 U.S. 386 | 69 |
| Estelle v. McGuire (1991) 502 U.S. 62 | 64 |
| Gideon v. Wainwright (1963) 372 U.S. 335 | 55 |
| Harmelin v. Michigan (1991) 501 U.S. 957 | 67 |
| House v. Bell (2006) 126 S.Ct. 2064 | 53 |
| Illinois v. Allen (1970) 397 U.S. 337 | 55 |
| In re Winship (1970) 397 U.S. 358 | 67 |
| Jackson v. Virginia (1979) 443 U.S. 307 | 61 |
| Kyles v. Whitley (1995) 514 U.S. 419 | 58, 61 |
| Manning v. Foster (9th Cir. 2000) 224 F.3d 1129 | 69 |
| Mathews v. U.S. (1988) 485 U.S. 58 | 61, 64 |
| Miller v. Pate (1967) 386 U.S. 1 | 53, 58, 61, 64 |
| Murray v. Carrier (1986) 477 U.S. 478 | 69 |
| Napue v. Illinois (1959) 360 U.S. 264 | 58, 61 |
| Osborne v. Ohio (1990) 495 U.S 103 | 61, 64 |
| Pointer v. Texas (1965) 380 U.S. 400 | 55, 58, 61 |
| Remmer v. U.S. (1954) 347 U.S. 227 | 61, 64 |
| Russell v. U.S. (1962) 369 U.S 749 | 61, 64 |

Rutledge v. U.S. (1996) 517 U.S. 277                                     67

Schlup v. Delo (1995) 513 U.S. 298                                   53, 69

Sheppard v. Maxwell (1966) 384 U.S. 333                                  61

Smith v. Robbins (2000) 528 U.S. 259                                     55

Solem v. Helm (1983) 463 U.S. 277                                        67

Strickland v. Washington (1984) 466 U.S. 668                    55, 61, 64

U.S. v. Bailey (1980) 444 U.S. 394                                  61, 64

U.S. v. Cronic (1984) 466 U.S. 648                              55, 61, 64

U.S. v. Gaudin (1995) 515 U.S. 506                                       61

U.S. v. Martinez (2000) 528 U.S. 304                                     64

U.S. v. Russell (1973) 411 U.S. 423                                 58, 64

U.S. v. Sablan (9th Cir. 1996) 92 F.3d 865                               67

U.S. v. Young (1985) 470 U.S. 1                                 58, 61, 64

Wiggins v. Smith (2003) 539 U.S. 510                                55, 61

Williams v. Taylor (2006) 529 U.S. 362                                   55

Eric C.R. K'nAPP (#J-10618)
Salinas Valley State Prison
Post Office Box 1050
Soledad, California 93960-1050

In Propria Persona

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In re:                                    Case Number: _____

ERIC CHARLES RODNEY K'nAPP,

Petitioner,                               BRIEF IN SUPPORT OF PETITIONER'S 28
                                          U.S.C. § 2254 FORM PETITION.
On Habeas Corpus.
_____/

        TO: THE HONORABLE PRESIDING JUDGE OF THE UNITED STATES DISTRICT COURT.

        Having completely exhausted all available remedies within the State of
California judicial system as of 3/25/08 (see, California Rules of Court, Rule
24 [a California court decision is usually final 30 days after it is filed]),
state prisoner Eric K'nAPP hereby petitions the Federal judiciary for
appropriate relief on Habeas Corpus.

        This brief is submitted as Attachment #1 to the mandatory form petition
with which Petitioner K'nAPP must initiate this present action pursuant to 28
U.S.C. § 2254.

///
///
///

# I.

## INTRODUCTION

In less than 30 minutes one night just three months after he turned 25, Petitioner Eric K'nAPP completely destroyed all that until then had been good in his life by engaging in sexually assaultive behavior while in a state of voluntary intoxication that occurred less than 24 hours after returning to the house wherein he had been physically and mentally traumatized over several years as a child.

Now in his 41st year, Eric K'nAPP takes responsibility for his actions of that night and wholeheartedly agrees that punishment is warranted for the specific acts he **truly** committed but **not** for several others which he is **actually innocent** of committing as alleged and demonstrated herein.

By and through this petition, Eric K'nAPP will show that overzealous prosecution and ineffective assistance of counsel at every material phase of trial caused and allowed him to suffer many **false** charges, a tainted and improperly instructed jury, perjured testimony by at least **three** main prosecution witnesses, wrongful conviction, and a severely enhanced sentence based on factors that were neither charged against him, submitted to a jury, nor proved to be true beyond a reasonable doubt.

As a result of such unconstitutional violations, Eric K'nAPP received and is now serving what essentially amounts to a life sentence **without** parole of 98 years in prison despite "the complete lack of record that Mr. K'nAPP has in terms of any criminal convictions" and "Mr. K'nAPP's productivity in the military, especially dealing with matters related to law enforcement." -- Trial Judge Kenneth G. Peterson at Sentencing. (Reporter's Transcript, pp. 1372, 1373.)

However, since the time that Eric K'nAPP began serving his sentence in 1994, he has obtained newly discovered evidence which completely undermines the prosecution's case and casts fundamental doubt on the accuracy and reliability of his conviction and sentence, particularly as to three **mis**joined counts involving a **second** woman whom he was **falsely** accused and convicted in the **same** trial of also sexually assaulting.

Wherefore, Eric K'nAPP prays for a Writ of Habeas Corpus to finally give him some type of meaningful relief from the gross miscarriage(s) of justice currently hanging like a dark cloud over his entire conviction and sentence.

///
///
///
///
///

2

## II.

### PROCEDURAL HISTORY

**A. People v. K'nAPP, CR118548, California Superior Court, Sacramento County.**

In August of 1993, a jury of eight women and four men declared Petitioner Eric K'nAPP guilty on 14 enhanced counts alleging that he had sexually assaulted a woman named Charlene on 8/4/91 and a woman named Sara on 11/22/92.

On February 18, 1994, Petitioner K'nAPP was sentenced to an aggregate term of 98 years in state prison, which he began to serve on 3/17/94.

**B. Direct appeal, C017988, California Court of Appeal, Third District.**

Represented by appointed counsel, the Appellant's Opening Brief filed on Petitioner's behalf appealed (1) the trial court's refusal to sever the weaker Charlene sexual battery case from the stronger Sara rape case (see, infra, § III, at B.2(g)); (2) the trial court's use of CalJIC 2.21.2 lessening the prosecution's burden of proof (id. at B.3(c)); (3) the trial court's forcing of Petitioner to put on and wear a ski mask while on the witness stand in front of the jury (id. at B.3(h)); and (4) the trial court's use of CalJIC 2.01 undermining the constitutional standard of proof beyond reasonable doubt (id. at B.4(a)).

On October 6, 1995, the Court of Appeal denied Petitioner's appeal in an unpublished opinion.

On December 22, 1995, the Supreme Court of the State of California declined to review the fourth enumerated appeal issue above concerning CalJIC 2.01.

**C. Petitioner's first discovery of new evidence while in prison.**

In June of 1997, Petitioner discovered that before he was additionally charged in the separate case involving Charlene, both the prosecution and his assigned public defender were in possession of evidence that he was innocent of committing a **third** sex case involving a woman named Barbara that was **also** charged against him in conjunction with the Charlene case, severed before trial, but allowed to remain pending against him so as to create a false "serial rapist" impression of him in the media up to the date he was sentenced. (See, infra at § III, B.1, B.2(a), B.3(a), B.3(i), B.3(j), B.4(b), and D.2.)

Moreover, in October of 2001, Petitioner obtained a sworn declaration wherein the attorney who had represented him at sentencing admitted to giving ineffective assistance of counsel. (See, infra at § III.F.)

**D. 1st habeas petition, 01F08858, California Superior Court, Sacramento County.**

On November 5, 2001, a petition for writ of habeas corpus was filed on Petitioner's behalf addressing, among several other grounds for relief: (1) the above newly discovered evidence of exculpatory material in the Barbara rape

3

case being illegally withheld from Petitioner by both the prosecution and the defense throughout all proceedings against him (see, infra at § III, D.2); (2) the above newly discovered evidence that Petitioner had received ineffective assistance of counsel at sentencing (infra at § III.F); and (3) that Petitioner's sentence is based on factors neither charged against him, submitted to a jury, nor proved beyond reasonable doubt as required by Amendments VI and XIV to the Constitution of the United States as declared by the U.S. Supreme Court in such cases as In re Winship (1970) 397 U.S. 358, and Apprendi v. New Jersey (2000) 530 U.S. 466. (See, infra at § III, B.4(f), and at III.E.)

The petition was denied on November 28, 2001, by Judge CHERYL CHUN MEEGAN, who had nothing at all to do with Petitioner's case at either trial or sentencing. (See, infra at § III.G.)

**E. Petitioner's second discovery of new evidence while in prison.**

In 2002, Petitioner obtained a sworn declaration wherein one of the two women he was convicted of sexually assaulting, Charlene, confessed that she had lied against Petitioner from the very beginning for reasons that included inducements made by agents of the Sacramento County Sheriff's Department and Office of the District Attorney, as well as various psychological and personal problems she was having at the time with things such as loneliness, depression, alcoholism, and sexual victimization both past and recent that included physical and mental abuse by the men in her life. (See, infra at § III.H.)

**F. 2nd habeas petition, C044019, California Court of Appeal, Third District.**

On May 16, 2003, another petition for writ of habeas corpus was filed on Petitioner's behalf that set forth all grounds for relief presented in the first such petition (supra at D) and added the above newly discovered evidence regarding his innocence in the Charlene case.

On July 31, 2003, the Honorable Presiding Justice SCOTLAND denied the petition "without prejudice to filing in the trial court a claim of innocence" regarding the Charlene case. (See, infra at § III.I.)

**G. 3rd habeas petition, 03F09161, California Superior Court, Sacramento County.**

On September 30, 2003, Petitioner returned to the Superior Court of California with a claim of innocence regarding the Charlene case as instructed by the Court of Appeal above.

However, on November 25, 2003, Judge CHERYL MEEGAN (supra at D) denied relief on what she called a successive, abusive, and otherwise procedurally barred petition that failed to establish Petitioner's "unerring innocence" in the Charlene case. (See, infra at § III.J.)

**H. Petitioner's third discovery of new evidence while in prison.**

In June of 2004, Petitioner's mother discovered evidentiary documentation that had been available to both the prosecution and Petitioner's defense counsel while Petitioner was in jail waiting to be sentenced that impeached or otherwise discredited key testimony given by a main prosecution witness named Lynn Rominger that was used against Petitioner both during trial and at sentencing. (See, _infra_ at § III.K.)

**I. 4th habeas petition, C049875, California Court of Appeal, Third District.**

On May 22, 2005, Petitioner submitted another petition for writ of habeas corpus presenting all grounds for relief presented in his previous three petitions (_supra_ at D, F, and G), an additional ground addressing the above newly discovered evidence which undermines the testimony given against him at trial and sentencing by one of the prosecution's main witnesses, another ground wherein the U.S. Supreme Court's recent decision in _Blakely v. Washington_ (2004) 542 U.S. 296 was used in support of his earlier claims regarding the severely enhanced sentence he received, and another ground arguing extensively against Judge CHERYL MEEGAN's denial of his third habeas petition on 11/25/03 despite the appellate court's instruction of 7/31/03. (See, _supra_ at F and G.)

Petitioner then experienced the following once the petition was filed:

1. Order to Show Cause

Issued 12/1/05 by the Honorable Presiding Justice SCOTLAND (_supra_ at F), the order was made returnable before the Superior Court on the newly discovered evidence of Petitioner's innocence in the Charlene case. (See, _infra_ at § III, M.1.)

2. Evidentiary Hearing

Conducted 5/2/06 before Judge CHERYL MEEGAN — even though the Court of Appeal had overturned Judge MEEGAN's earlier denial(s) in favor of Petitioner (_supra_ at D, G, and I) — subsequent relief was denied by MEEGAN on 7/28/06. (See, _infra_ at § III, M.2 and M.3.)

3. Return to Court of Appeal

Filed 10/23/06, a habeas petition challenged Judge MEEGAN's denial of relief following the above evidentiary hearing, but was afterward summarily denied on 11/16/06 by an acting presiding justice named CANTIL-SAKAUYE. (_Id._ at M.4.)

4. Petition for Review

Filed 11/21/06, the petition sought review of whether the courts below had erred in denying Petitioner any type of relief on the basis of the newly discovered evidence demonstrating his innocence in the Charlene case, but

the California Supreme Court issued an order declining to thus review the
matter, which Petitioner received on 2/16/07. (Id. at M.5 to M.7.)

**J. Final habeas petition, S156134, California Supreme Court.**

Prior to and after receiving the California Supreme Court's denial of his
above Petition for Review on 2/16/07, there was an ongoing State of Emergency
throughout the California Department of Corrections and Rehabilitation
(hereafter "CDCr").

Severe staff shortages, overcrowding, and other such crises conditions had
been and continued to cause persistent lockdowns and loss of normal program
activities within all CDCr prisons, including where Petitioner was housed at
Salinas Valley State Prison in Monterey County.

As a result of the crises conditions within the CDCr, three Federal judges –
HENDERSON, KARLTON, and REINHARDT – were empaneled to put the CDCr under
Federal receivership.

In addition, Petitioner had been and still at the time was having to
represent himself without counsel not only in his criminal habeas corpus case,
but also in the following civil cases:

| | | |
|---|---|---|
| K'nAPP v. Hickman | 2:05-CV-02520 | U.S. Dist. Ct., E.D. Cal. |
| K'nAPP v. White | 07-16156 | U.S. 9th Cir. Court of Appeals |
| K'nAPP v. Knowles | 2:06-CV-00453 | U.S. Dist. Ct., E.D. Cal. |
| | 07-16225 | U.S. 9th Cir. Court of Appeals |
| K'nAPP v. Adams | 1:06-CV-01701 | U.S. Dist. Ct., E.D. Cal. |
| K'nAPP v. Harrison | CV-06-7702 | U.S. Dist. Ct., C.D. Cal. |
| K'nAPP v. Super. Ct. | C055940 | Cal. 3d Dist. Court of Appeal |
| In re K'nAPP | HC 5571 | Cal. Super. Ct., Monterey Co. |
| In re K'nAPP | HC 5577 | Cal. Super. Ct., Monterey Co. |
| In re K'nAPP | HC 5725 | Cal. Super. Ct., Monterey Co. |
| In re K'nAPP | HC 5790 | Cal. Super. Ct., Monterey Co. |
| In re K'nAPP | HC 5844 | Cal. Super. Ct., Monterey Co. |

Moreover, prison officials were so unconstitutionally refusing not only to
afford Petitioner meaningful and unimpeded access to the courts but also to
grant Petitioner a reasonable accommodation concerning his verified medical
writing impediment that Petitioner has since sought relief through a 42 U.S.C.
§ 1983 civil action filed in the U.S. District Court for the Northern District
of California on 1/22/08. (See, Case No. CV 08 0719 JSW, Claims 17, 18, and 19
[pp. 41 to 48].)

As a result of all the above, Petitioner was substantially hindered in his
efforts to most effectively research, brief, and otherwise present each Ground

6

for Relief in this matter to the California Supreme Court. However, fearing that any further delay might cause him to suffer an adverse procedural hurdle in state and/or federal court, Petitioner realized that he needed to hurry up and get at least something submitted to the California Supreme Court even though he had thus far been able to brief only the very first of his six Grounds for Relief in this matter.

Accordingly, on 9/6/07, Petitioner was finally able to mail a habeas corpus petition to the California Supreme Court which included every claim he had previously raised in the courts below. In so doing, however, Petitioner motioned the California Supreme Court for permission to file a Supplemental Points and Authorities regarding Grounds for Relief 2 through 5 at a later date to be determined by the California Supreme Court upon consideration of all circumstances that had been and still were impairing his ability to more effectively represent himself in propria persona. As an alternative, Petitioner motioned the California Supreme Court to consider appointing counsel to at least **assist** him in researching, drafting, and/or otherwise preparing a Supplemental Points and Authorities regarding Grounds for Relief 2 through 5 in his final petition.

Subsequently, on 3/4/08, Petitioner received the California Supreme Court's following answer to his final petition:

> The petition for writ of habeas corpus is denied. (See In re Clark (1993) 5 Cal.4th 750; In re Robbins (1998) 18 Cal.4th 770, 780; In re Miller (1941) 17 Cal.2d 734; People v. Duvall (1995) 9 Cal.4th 464, 474.)
> George, C. J., and Corrigan, J., were absent and did not participate.

As a result of the California Supreme Court's above denial, Petitioner Eric K'nAPP believes he now has no other remedy except by means of 28 U.S.C. § 2254.

///
///
///
///
///
///
///
///
///
///
///
///

7

## III.

### STATEMENT OF FACTS

"It should be remembered that an accusation of violations of the sections before us is an 'accusation easily to be made and harder to prove, and harder to be defended by the party accused though never so innocent', and that there is **no** class of prosecutions attended with so much danger, or which afford so ample an opportunity for the free play of malice and private vengeance. In such cases the accused is almost **defenseless**, and courts, in view of the facility with which charges of this character may be invented and maintained, have been strict in laying down the rule which **should** govern the jury in their finding." (People v. Stanley (1967) 67 Cal.2d 812, regarding alleged sexual offenses [citations omitted].)

**A. Petitioner's history up to and including his arrest on 11/22/92.**

Eric K'nAPP was born out of wedlock in California on 8/27/67. (CT 308.) Between the ages of six and eight years old, he was sexualized in various ways while in the supposed care of others with whom his recently divorced mother had been forced to entrust him while she worked to support herself and her two young children. (CT 308.)

When Eric was nine, his mother moved with him to Arizona, where she met and married a man named Ron Boatman. Soon after the wedding, it was learned that Ron Boatman had severe kidney problems, which soon prevented him from working and forced Eric's mom to become an in-home dialysis nurse to her new husband.

Over the next several years, Boatman physically abused and mentally terrorized Eric nearly every day while they lived in "the house" at 11429 North 57th Lane in Glendale, Arizona. (CT 308.) Eric was 14 when his mother moved with him back to California after she and Boatman divorced.

Living less than 300 yards from the ocean in Newport Beach, Eric adjusted well to his new life. He enjoyed attending Newport Harbor High School, was a Junior Varsity wrestler, had a girlfriend, found the best friend he had ever known in a South African white teen named Bradley Kaye, and worked evenings at a shop in nearby Balboa Beach that rented bicycles, skates, and miscellaneous beach equipment to visiting tourists. But even with the tormented years in Arizona behind him, Eric suffered horrible nightmares for many subsequent years involving Ron Boatman and "the house" in Glendale.

Less than a month before Eric's 17th birthday in 1984, his best friend from high school, Bradley Kaye, was murdered by Bruce Ralph, Bradley's former stepfather, and left buried on a construction site for several days until workmen finally discovered his body. By shooting Bradley point-blank in the heart and hiding his body, Bruce Ralph had imagined that Bradley's mom would

8

come running back to him for his love and support in trying to find her "missing" son. But Ralph was promptly arrested after Bradley's body and missing car were located a short time later.

When Eric learned the details of Bradley's murder, he suffered a deep and painful grief that he had never before known anyone could feel. The trauma of losing his friend in such a violent manner caused Eric to become severely suicidal. (CT 308.)

Eric enlisted in the U.S. Armed Forces just a few months after Bradley was murdered. He wanted out of Orange County to get away from all the memories of Bradley that were there and what his stepfather had done to him. Eric served in the military with honor and distinction over the next several years. Specializing in law enforcement and emergency medical response as a military policeman, combat medic, and emergency medical technician, Eric eventually became a noncommissioned officer at the rank of sergeant. (CT 264 to 303.)

In December of 1990, Eric married a young woman named Erin. Just a few days later, both Eric and Erin were ordered by the military to report for duty in separate locations, Eric to Saudi Arabia for the first Gulf War, Erin to South Carolina for military training. Several difficult months later, Eric and Erin were able to reunite but struggled to establish a life together in Sacramento County following the months they were forced to be apart. (RT 676, 677.) They eventually split up soon after Eric began working as a Counterdrug peace officer for the State of California near the end of 1991.

For the next nine or ten months into 1992, Eric tried to relieve the pain of his failed relationship with Erin by drinking excessively and engaging in a whirlwind of uninhibited, illicit, and otherwise promiscuous sexual encounters with many different women, including an emotionally torrid relationship with a woman named Annette McNeely. (CT 267.) Eric also distracted himself by working longer hours and taking on more and heavier responsibilities as a Counterdrug peace officer. He received much praise and recognition from his superiors, especially after his exceptional performance in Los Angeles during the riots of April and May 1992 that followed the verdicts of not guilty rendered for the officers who had beaten Rodney King. As a result of all his hard work and dedication, Eric was eventually put in charge of coordinating statewide Drug Demand Reduction operations from within the Office of the Adjutant General for the California Army and Air National Guard in Sacramento. (CT 264 to 303, RT 616, 679-80.)

On November 18, 1992, Eric had to fly to Arizona to attend a 3-day Counterdrug conference in Scottsdale. (RT 620, 623.) It was his first time back

in the Phoenix area since his mother had gotten him away ten years earlier.

On November 20, 1992, the night before his scheduled flight back to Sacramento, Eric drove a rental car to "the house" in nearby Glendale. Finding it vacant and up for sale, he opened a backyard window and went inside to visit a while with several bottles of alcohol he had purchased along the way.

As Eric drank and roamed the empty house, each room triggered different visions of the past and feelings of the panic and dread that he had not experienced since he was there a decade earlier. He soon became so overwhelmed by such flashbacks to the abuse he had suffered over the course of several years in that house as a child that he began to sob and cry hysterically. Even after fleeing from inside the house he had great difficulty regaining control of himself while driving back to where he was staying in Scottsdale.

After getting back to his hotel room around 4:30 a.m. on 11/21/92, Eric slept only a short while before having to get up for the final session of the Counterdrug conference. He drank at least ten cups of coffee and several colas all throughout the morning hours of the conference to stay awake and mask the odor of alcohol on his breath from the night before.

When the conference ended at noon on 11/21/92, Eric flew back to Sacramento and arrived at his apartment around 6:00 that evening. (RT 620.) He was emotionally raw from everything that had happened in Arizona. Moreover, he felt an uncomfortable level of angst and nervousness caused by all the caffeine and sugar he had consumed earlier at the conference. (RT 622, 624.) He therefore wanted to start drinking right away to "relax" (RT 623), but was expecting visitors from a local church who earlier in the week had scheduled to meet with him that night so they could share their religious beliefs (Mormonism) and show him a video they thought he might enjoy. (CT 267, RT 621, 622.) The video, however, caused Eric to weep with heavy emotion less than halfway through. Created by the Church of Jesus Christ for Latter-day Saints, the video depicted idealized family units whose members were loving, nurturing, and supportive both morally and spiritually -- all of which Eric wished for in his own past, present, and future family life.

After his Mormon visitors left his apartment around 9:00 p.m., Eric tried to make contact with some of his past friends from when he had lived in Arizona ten years before. (While still at the hotel in Scottsdale earlier that morning, Eric had torn many pages out of a Phoenix Metropolitan Area phonebook which listed several last names he recognized from the past.) Eric then called his slightly younger sister and talked with her about their childhood years in Arizona. Eric discovered that both he and his sister had lately been wanting to

seek out and obtain counseling for themselves individually as well as together with each other and their mother as a family. (CT 267.)

But when Eric then called his mother and asked if she would join him and his sister in counseling, his mother ridiculed the idea and said that he and his sister needed to grow up and stop dwelling on the past about "normal" events that happen in "every" child's life.

As a result, Eric became so upset that he slammed down the phone and decided to commit suicide then and there. But while filling up his bathtub and trying to write a final note for when he would be found, something caused him to change his mind and get out of his apartment. He felt a desperate need to find a crowd of people enjoying life where he could safely try to feel better by drinking and interacting among them. He therefore drove to the only place he knew in Sacramento -- a Bobby McGee's nightclub restaurant he had been to just a few times before several months earlier with fellow members of the Counterdrug taskforce he had been part of prior to getting assigned to Drug Demand Reduction operations. (Supra, and RT 623, 678-79.)

Thus it was that Eric K'nAPP -- after consuming six or so shots of tequila and Jaegermeister liquer over a very short period of time the night of 11/21/92 (RT 625, 626, 631) -- left the Bobby McGee's nightclub restaurant and committed several illegal and otherwise shameful acts within the first hours of 11/22/92. (CT 267.)

**B. People v. K'nAPP, CR118548, California Superior Court, Sacramento County.**

At approximately 8:30 p.m. on 11/22/92, Petitioner Eric K'nAPP was arrested at his apartment by detectives investigating a sexual assault alleged to have occurred 18 hours earlier near the Bobby McGee's nightclub restaurant where Eric had gone the night before. (Supra.) The detectives had a physical description and vehicle license plate number matching Petitioner's which made them suspect Petitioner of following a 24 year-old woman named Sara home from the area of Bobby McGee's and sexually assaulting her in her bedroom while armed with a knife and wearing a ski mask.

1. Petitioner's Charges

Petitioner was taken into custody and jailed after declining to be questioned without counsel present. His bail was set at $1 million and he was charged with 14 separate counts of Penal Code violations as follows:

**(a) Information filed 11/24/92 (CT 8):**

|  |  |
|---|---|
| Counts 1 & 2: | Section 261(2) [sic], rape; |
|  | Section 12022.3(a), use of deadly weapon (knife); |
| Counts 3 - 5: | Section 288a(c), oral copulation; |

11

<table>
<tr><td></td><td>Section 12022.3(a), use of deadly weapon (knife);</td></tr>
<tr><td>Counts 6 - 9:</td><td>Section 289, digital penetration;</td></tr>
<tr><td></td><td>Section 12022.3(a), use of deadly weapon (knife);</td></tr>
<tr><td>Counts 10 - 12:</td><td>Section 243.4, sexual battery;</td></tr>
<tr><td></td><td>Section 12022(b), use of deadly weapon (knife);</td></tr>
<tr><td>Count 13:</td><td>Section 459, burglary;</td></tr>
<tr><td></td><td>Section 12022(b), use of deadly weapon (knife);</td></tr>
<tr><td>Count 14:</td><td>Section 245(a), assault with deadly weapon (knife).</td></tr>
</table>

Two weeks after being thus charged, Petitioner was recorded telling a girlfriend over the phone during visits on 12/10/92 and 12/14/92 that although he had indeed been at Sara's house on 11/22/92, Sara had not been completely truthful about everything that happened there and why.

When Petitioner's assigned deputy public defender learned of the recorded visit conversations, she went to the jail and angrily reprimanded Petitioner because "you ruined my case!" She told Petitioner, "Defendants are **never** supposed to tell **anyone** if they were involved with an alleged crime -- **not even me!** -- because it makes whoever you tell a witness and eliminates the prosecution's burden of proving identity!"

Soon thereafter, Petitioner learned he was being charged in two other alleged sexual assaults, the first to have occurred against a 21 year-old woman named Charlene 15 months earlier on 8/4/91, the second against a 35 year-old woman named Barbara 12 months earlier on 12/6/91. Petitioner truly had no involvement whatsoever in the alleged rape case concerning Barbara, which was **eventually** dismissed against him altogether, but became shocked when he realized upon reading the criminal report of the Charlene case not only that he in fact **was** the person Charlene had been with on 8/4/91, but also that Charlene had **falsely** accused him of sexual battery and digital penetration in what had taken place between them on that date.

However, not forgetting the above **admonishment** he had just recently been given by his assigned counsel from the Office of the Sacramento County Public Defender, Petitioner never told **anyone** either that he had indeed been with Charlene on 8/4/91 or the truth of what had actually happened between them that day.

The Charlene and Barbara cases were then joined and simultaneously charged against Petitioner as follows:

**(b) Information filed 12/23/92:**

<table>
<tr><td>Count 1:</td><td>Section 243.4(a), sexual battery (Charlene);</td></tr>
<tr><td>Counts 2 & 3:</td><td>Section 289(a), digital penetration (Charlene); and</td></tr>
</table>

1         Count 4:        Section 261(a)(2), rape (Barbara).

2     All three cases -- concerning Sara, Charlene, and Barbara -- were then

3 combined against Petitioner as follows:

4   **(c) Information filed 2/22/93 (CT 18-26):**

5         Counts 1 & 2:    Section 261(a)(2), rape (Sara);

6                      Section 12022.3(a), use of deadly weapon (knife);

7         Counts 3 - 5:    Section 288a(c), oral copulation (Sara);

8                      Section 12022.3(a), use of deadly weapon (knife);

9         Counts 6 - 9:    Section 289(a), digital penetration (Sara);

10                     Section 12022.3(a), use of deadly weapon (knife);

11         Count 10:       Section 243.4(a), sexual battery (Sara);

12                     Section 12022(b), use of deadly weapon (knife);

13         Count 11:       Section 459, burglary (Sara);

14                     Section 12022(b), use of deadly weapon (knife);

15         Count 12:       Section 245(a)(1), assault with [knife] (Sara);

16         Count 13:       Section 243.4(a), sexual battery (Charlene);

17         Counts 14 & 15: Section 289(a), digital penetration (Charlene);

18         Count 16:       Section 261(a)(2), rape (Barbara); and

19                     Section 12022.3(a), use of deadly weapon (knife).

20 **2. Significant Pretrial Events**

21   **(a) Prejudicial publicity:**

22       From Petitioner's arrest on 11/22/92, until after he was sentenced on

23 2/18/94, various agents of the Sacramento County Sheriff's Department

24 and Office of the District Attorney manipulated the Sacramento Bee and

25 Sacramento Union newspapers into running at least 20 highly inflammatory

26 articles about Petitioner that were loaded with patently false

27 information and conclusory allegations **not** based on any known or proven

28 facts. The stories **falsely** represented that Petitioner was **known** to be a

29 "**serial** rapist" currently "jailed as a suspect in **three** rapes" who --

30 viewing women as "the enemy" -- "utilized military training" to "observe

31 and capture" them "throughout the nation." (See, post at Grounds for

32 Relief 3 and 4.)

33   **(b) Undue influence causing prejudicial waiver of preliminary hearing:**

34       Counsel for the defense manipulated Petitioner into waiving his right

35 to a preliminary hearing without explaining to Petitioner its purpose or

36 importance.

37       Petitioner will demonstrate in this petition (see, post at Grounds

38 for Relief 2 through 5) how his waiver **in ignorance** of a preliminary

hearing caused him significant prejudice at trial when the jury learned through an emotional courtroom outburst that Petitioner was also charged with a **second** rape (i.e., the severed case concerning Barbara [see, supra at 1(c); see also, infra at 2(g) and 3(i), 3(j)]).

Petitioner will also demonstrate herein that both the prosecutor and his defense counsel were very early on in possession of documentary and eyewitness evidence establishing Petitioner's **innocence** in the Barbara rape case, but that not only was such **exculpatory** evidence unduly **not** presented at any preliminary hearing but also it was unlawfully **not** revealed to Petitioner until **after** he was already serving his sentence in prison. (See, infra at D.2.)

**(c) First Marsden motion for change of counsel:**

After the Office of the Sacramento County Public Defender learned that Petitioner's visits with his girlfriend had been recorded (supra at 1(a)), Petitioner's assigned counsel, Diane Howard, told Petitioner's family that "I no longer have the heart" to defend Petitioner at trial but that she wanted to do so anyway for the experience. Petitioner therefore motioned the court for new counsel, whereupon attorney Dennis Owen Higgins was appointed by the court to Petitioner's case on 3/9/93. (CT 30-38, Supp. RT 24.)

**(d) Plea negotiations:**

The Office of the Sacramento County District Attorney offered Petitioner a stipulated term of 80 **years** for a guilty plea as to all 16 counts in the three separate cases. (Supra at 1(a) to 1(c).) But Petitioner was unable to even consider accepting such an offer because he truly did have **nothing at all** to do with the Barbara rape case, and did **not** sexually batter or digitally penetrate Charlene in what had taken place between them on 8/4/91.

Subsequently, Petitioner's court-appointed counsel, Dennis Higgins (supra), sought an independent offer from a female Judge of the Superior Court, JANE URE, but Judge URE's offer of 59 **years** also required Petitioner to plead guilty in all three cases regardless of his **actual innocence** in the cases concerning Charlene and Barbara. Petitioner implored Judge URE to make him an offer on just the Sara case, but 59 **years** was all she would offer. (Supp. RT 16.)

Then, just before trial, Petitioner's attorney Dennis Higgins sought another offer from Judge KENNETH G. PETERSON, the Superior Court judge appointed to preside over Petitioner's trial. However, Judge PETERSON

declined to either undercut the **59-year** offer made by Judge URE or make Petitioner an offer on just the Sara case. (Supp. RT 31, 33-37.) Petitioner therefore felt he had no better option than trial.

**(e) Lack of preparation by defense counsel:**

In the months, weeks, and days after being appointed by the court on 3/9/93 to represent Petitioner (supra), attorney Dennis Higgins did **very little** in preparation for trial. The only "defense strategy" he ever even mentioned was merely having Petitioner take the stand to dispute any identity evidence in the Charlene sexual assault case and to explain how and why he believed the sex was consensual in the Sara rape case. But attorney Higgins also told Petitioner that it was neither allowed nor ethical for him to give Petitioner any kind of practice or insight regarding how his testimony would be at trial.

Attorney Higgins admitted that had **no** confidence in his ability to meaningfully defend Petitioner at trial, and confessed to further difficulty he would have defending Petitioner if someone had done with his own daughter what Petitioner was accused of doing with Sara on 11/22/92. Moreover, Higgins kept pressuring Petitioner to just plead guilty in **all three cases** for Judge URE's **59-year** offer even though both Higgins and the prosecution were in possession of evidence establishing Petitioner's **actual innocence** in the Barbara rape case. (See, supra at 2(b), infra at D.2, and post at Grounds for Relief 2 through 4.)

From the time of his appointment to Petitioner's case on 3/9/93 to the time trial began on 8/16/93, attorney Higgins refused to have any meaningful discussions with Petitioner about the case. (Supp. RT 15-20.) Petitioner repeatedly pleaded with Higgins in letters and phone calls to speak with him about anticipated defense strategy, the testimony Petitioner should or should not give at trial, questioning of prospective witnesses for the defense and prosecution, rebuttal of any adverse witness testimony and/or other evidence, and other such matters related to the coming trial. However, not until approximately two days before trial began, on or about 8/14/93, did Higgins finally come to the jail to meet with Petitioner, but all he had with him was a 2" stack of previously undisclosed discovery pages from the prosecution and a 4-page letter, which he merely pushed toward Petitioner and then left without saying anything further despite Petitioner's pleas for him to stay and talk about the case. (Suppl. RT 22.)

///

15

**(f) Second Marsden motion for change of counsel (Suppl. RT 8-39):**

Just before jury selection began, Petitioner motioned for another attorney based on the above lack of preparation and communication by attorney Higgins up to that point. During the in camera hearing that followed, however, attorney Higgins blatantly lied to Judge PETERSON about the number of times he had visited Petitioner at the jail and about the extent of his preparation for trial. As a result of being lied to by attorney Higgins, Judge PETERSON denied Petitioner's motion for new counsel and allowed the case to go to trial with Higgins representing Petitioner.

**(g) Severance motion:**

On August 16, 1993, the day Petitioner's trial began, the trial court heard a motion by Petitioner's attorney to have the Charlene and Barbara counts severed from those concerning Sara. (CT 46-82.)

Petitioner's attorney based the motion on People v. Smallwood (1986) 42 Cal.3d 415, wherein the Supreme Court of California stated that "joinder under circumstances where the joined offenses are not otherwise cross-admissible has the effect of admitting the most prejudicial evidence against an accused." (See, id. at 429, 430, citing with approval United States v. Burkley (D.C. Cir. 1978) 331 F.2d 903, 919 ["The fear is that when two or more crimes are tried together, and the evidence of one is greater than that of the other, the jury may **infer** [that] because the defendant **appears** to have committed at least **one** of the crimes, he has a **propensity** to commit crime [and thus] treat this **assumed** criminal **disposition** of the defendant as **evidence** that he committed the other crime(s) with which he is charged" (emphases added)].)

Judge PETERSON, however, denied the motion as to Counts 1 through 15 involving Sara and Charlene, but allowed a stipulated severance of Count 16, the sole remaining weapon-enhanced charge in the Barbara rape case. (CT 101, RT 13-27.)

## 3. Significant Events of Trial

Beginning August 16, 1993, Petitioner's 7-day trial took place before a single jury comprised of **eight women** and only four men on the separate but joined cases concerning Sara and Charlene. (See, supra at 1(c).)

The testimony and evidence adduced at trial is generally set forth in the record of Petitioner's direct appeal in the California Court of Appeal, Third Appellate District Case Number C017988. (See, infra at C.)

However, Petitioner submits the following information from the appellate record as especially relevant to the particular contentions of this petition set forth elsewhere herein. (See, *ante* at § IV.)

**(a) Prejudical publicity:**

As previously stated herein (*supra* at 2(a)), agents of the Sacramento County Sheriff's Department and Office of the District Attorney caused the two major newspapers in the Sacramento area to run many false and highly prejudicial articles about Petitioner while he was in jail, at least eight of which ran during the time of Petitioner's trial. (See, *post* at Grounds for Relief 3 and 4.)

**(b) Petitioner's mother angers trial judge:**

On the day of initial trial proceedings, Petitioner's mother placed a handwritten note on the seat of the judge's bench while the courtroom was empty. When the judge discovered the note on the spot where he was about to sit, he angrily admonished Petitioner and Petitioner's mother in open court. However, upon looking through the trial record, Petitioner has discovered that everything related to this event is mysteriously **absent** from his trial transcripts. However, two reporters from different newspapers were there that day and reported on the event as follows:

### Rape trial disrupted by mother

by T.G. Swauger, Sacramento Union, 8/19/93

A personal drama formed outside the courtroom as well as on the witness stand during opening day as K'nAPP's mother, Barbara Bird, denounced her son's defense attorney and vowed to wrestle away the reins of her son's defense.

The Orange County businesswoman, who admits she has no legal experience, disrupted the court [and, c]alling the trial a "slam-dunk railroad job," demanded K'nAPP's court-appointed lawyer delay the trial, saying she was unprepared. ...

When the courtroom was empty a few minutes later, Bird sneaked an unsigned note to the bench of Superior Court Judge Kenneth G. Peterson, claiming her son had asked for new counsel, and that Higgins was unable to win her son's release. The note also asked to speak with the judge concerning her son.

For her efforts, Bird received a scolding from Peterson about proper procedures as well as security inside a courtroom. Before he destroyed the message, he warned her she would be removed if she became disruptive or attempted to speak directly to the jury.

**Plea disrupts start of trial...**

By Ramon Coronado, Sacramento Bee, 8/18/93

The trial ... was disrupted Wednesday [8/18/93] when [K'nAPP's] mother [Barbara Bird] pleaded with a judge to let her be her son's lawyer. ...

Bird, who has no legal training, told the judge she was more qualified to fight for her son than K'nAPP's court-appointed lawyer.

"I don't think my son's right to a fair trial has been recognized," Bird said. She said the trial was a "slam-dunk railroad job."

K'nAPP's lawyer, Dennis Owen Higgins, declined to discuss Bird's accusations with reporters. He also refused to talk to Bird.

[Judge] Peterson eventually denied Bird's request, saying a pretrial court proceeding resolved the issue of K'nAPP's legal representation.

But Bird persisted and the judge's patience wore thin.

"I think it is important that the mother of a defendant be allowed to attend (court proceedings), but I will have you arrested if there are any further outbursts," Peterson admonished the woman.

**(c) Jury instructions before evidence (CT 102, RT 47-57):**

Petitioner's jury received several instructions both verbally and in print just before the prosecution and defense presented their cases. Among the instructions that were given, Petitioner submits the following as relevant to his contention and argument later herein that the jury was improperly instructed (see, post at § IV; Grounds for Relief 4 and 5):

2.00          Direct/Circumstantial Evidence

2.21.2        Willfully False Testimony

**(d) Testimony of Sara case (Counts 1-12):**

Petitioner's conviction and sentence are based on the versions of facts set forth in the record on appeal in Case Number CO17988. (Supra.)

However, although this petition for a writ of habeas corpus involves **newly discovered evidence** that demonstrates Petitioner's **actual innocence** in the counts related to **Charlene** (see, supra at B.1, infra at H, and post at Grounds for Relief 1 and 2), Petitioner feels he should include certain information adduced at trial regarding the Sara case since Charlene's false testimony necessarily contributed to Petitioner's convictions of all counts concerning Sara, including several he did **not**

18

commit.

## Sara's Testimony

In 1992, Sara was living in a 2-story house in Orangevale with her mother, her mother's boyfriend, her sister, and her aunt. (RT 95, 96.)

In the evening on November 21, 1992, Sara drove to Ed Van Bebber's apartment across from a Bobby McGee's nightclub restaurant off Sunrise Boulevard near Citrus Heights. (RT 164, 165.) Sara and Ed went on a double date with Charlie and Debbie Cordell. The four visited several entertainment spots, not one of which was said to have been the Bobby McGee's nightclub restaurant across from Van Bebber's apartment. (RT 81-84, 86, 168-70.) While out with Ed and the Cordells, Sara drank at least two alcoholic beverages. (RT 170, 227.) Around midnight, the Cordells dropped Sara and Ed off in front of Ed's gated apartment complex directly across from Bobby McGee's. (RT 78, 79.) Sara left Ed's apartment shortly thereafter and drove back to the house in Orangevale. (RT 100.)

Sara parked in the driveway and entered the house through a garage door. (RT 104, 175.) She ate some food, removed her contact lenses (which she testified she is "basically blind" without [RT 185, 186]), and got into bed with **all** lights in the "completely dark" house turned **off.** (RT 110, 111, 115.) Once in bed, Sara said she saw her bedroom door open and someone approaching in the darkness who she at first thought was a boyfriend of hers named Jesse but then realized was someone else **after** she saw the color of his eyes. (RT 120, 187, 190.)

Sara said she then felt a gloved hand on her mouth and a knife against her neck. She somehow saw through the **unlit darkness** (RT 180-84) that Petitioner had "distinctive" blue eyes, a light mustache, and was wearing a dark ski-type **mask. (RT 120-24.) She** said that Petitioner threatened to harm her and her family if she made any noise. (RT 123.)

Sara testified that she told Petitioner she had not had sex in six months because she "wanted him to feel sorry for me." (RT 201.) She said that Petitioner told her to take off her sweatpants and underwear, which she did. (RT 129-30.) She said Petitioner touched her stomach and breasts and told her he had seen her at Bobby McGee's and that she was beautiful. (RT 130-31.) She said he kissed her breasts, moved his finger in and out of her vagina, and orally copulated her. (RT 132-34.) She said that Petitioner then had her get out of bed and bend over at the waist facing away from him so he could look at her from behind and

19

masturbate. (RT 136, 207.)

She said Petitioner then instructed her to sit on his lap while still facing away from him and then fumbled around to get his penis inside her. She initially testified that she was not sure his penis had ever actually gotten inside her (RT 211), but the next day -- after some overnight coaching by the prosecution -- she testified that it had. (RT 216.) (However, Petitioner's jury was not entirely convinced that this particular act of penetration had ever really occurred, as evidenced by their question to the judge during final deliberations [CT 143, 144].)

From his lap, Sara testified that Petitioner laid her back down on the bed and resumed orally copulating her. (RT 138-39.) She said he then fumbled around to get his penis inside her a second time. (RT 139-40.) She said the series of events ended with her orally copulating Petitioner until he orgasmed. (RT 141.)

Sara testified that the presence of the knife and threat of harm to her and her family kept her from crying out or otherwise resisting. (RT 136-40.) But she also testified that Petitioner did not inflict any physical pain or discomfort on her, had immediately apologized afterward, and then left, although not before threatening her to not report the incident. (RT 143-44, 146.)

Sara said she then went downstairs to ensure Petitioner was gone, searched the entire house (RT 150), and at approximately 12:45 a.m. telephoned Ed Van Bebber. (RT 80, 84, 151.) At Van Bebber's urging, Sara said she then woke up her mother and told her what had happened. (RT 64, 85, 151.) She was then taken to a hospital and examined, whereupon the police were subsequently notified. (RT 304, 318, 155.)

There were many discrepancies and inconsistent statements not only in what Sara had initially told detectives immediately following the incident of 11/22/92 but also in her testimony at Petitioner's trial in August of 1993. However, as soon as Sara started having difficulty on cross-examination by Petitioner's attorney explaining such things about the series of events she alleged had happened inside her bedroom on 11/22/92, the trial judge interrupted the proceedings, acknowledged confusion, but, rather than let Petitioner's attorney finish exposing various falsehoods and weaknesses in Sara's testimony, called a recess until the following day. But upon taking the stand for further cross-examination by Petitioner's attorney the next day, a much more confident and refined Sara firmly and abruptly asserted that all of her

previous discrepancies were because the events had taken place nine months earlier so she was unable to remember exactly what had happened in which order. (RT 218, 230.)

### Petitioner's Testimony

Beginning at RT 617, Petitioner testified at length about how and why he had believed -- at least initially -- that the sex with Sara that night was consensual and that Sara herself had actually initiated several of the individual acts charged against him. (See, e.g., RT 794.)

Petitioner drove to Bobby McGee's following what had just taken place at his apartment. (See, supra at A; RT 620-23.) After consuming several shots of tequila and Jaegermeister herbal liquer at the bar, Petitioner approached and had a conversation with a woman he believed had been smiling at him from across the room. (RT 623-26.) The woman seemed intrigued by Petitioner's work as a Counterdrug peace officer, and made sexually suggestive remarks when Petitioner told her about Counterdrug taskforce members wearing balaclavas -- a type of head and face covering -- when serving warrants, conducting raids, and sometimes having to cuff unclothed individuals who had just been sleeping, showering, and sometimes having sex. (RT 626-31.)

When Petitioner offered to buy the woman a drink, she asked if Petitioner had ever had a "blowjob" -- which she laughingly explained is a type of drink. But when Petitioner returned from the bar with shots of tequila for them both, he did not see the woman where they had just been sitting so waited around a while, drank the tequila himself when she did not return, and eventually decided to leave. (RT 631-32.)

Realizing he had consumed too much alcohol and was some distance away from his apartment, Petitioner prepared to drive home with his car windows down so the cold winter air would help him stay alert. (RT 633.) As he was putting on a sweatshirt before getting into his car, he saw who he at the time thought was the same woman he had spoken with earlier inside Bobby McGee's. (RT 633-34.) She and a man were getting into a red pickup truck together, in which Petitioner then watched them drive away as he continued dressing more warmly for the drive back to his apartment. (RT 634.)

But as Petitioner was exiting the parking lot behind Bobby McGee's, a car pulled out in front of him from the gated apartment complex that was off to his left. (RT 635.) The driver of the car appeared to be the same woman he had just watched being driven away by the guy in the red pickup

1    above (RT 634); i.e., Petitioner thought the woman driving the car was
2    the very woman he had met earlier that night inside Bobby McGee's. (Id.)
3    He therefore followed behind her to see if she would stop anywhere
4    nearby so he could talk with her some more. (RT 635-36.)

5        The woman drove into a very nearby residential area and was already
6    parked in her driveway by the time Petitioner pulled up to an adjacent
7    stop sign at the top of her street. (RT 636.) Petitioner was halfway
8    through the 3-way intersection when he saw the woman getting out of her
9    car off to his left. (Id.) He therefore parked his car in the first open
10   space along the curb -- which happened to be on the left side of the
11   street -- and hurried around the corner on foot to where he had just
12   seen the woman seconds before. (Id.) But when he arrived and discovered
13   the woman had already gone inside, he hurried back to close his car's
14   still-open windows because it was beginning to drizzle heavily outside.
15   (Id.) Then, after a disoriented drive through the unfamiliar
16   neighborhood, Petitioner managed to relocate the woman's house and park
17   his car along the curb directly in front. (RT 637.)

18       Here Petitioner regretfully admits to this        Court is the point
19   in giving his testimony at trial that he started mixing facts with
20   fabrications in a desperate but wholly unsuccessful attempt to explain
21   away the sheer outrageousness of what he did next in entering the house,
22   picking up a kitchen knife from off the drainboard near the sink,
23   donning his Counterdrug balaclava, entering Sara's bedroom in the dark,
24   and engaging her in a series of sexual acts after making her aware of
25   the presence of the knife. In other words, Petitioner is confessing to
26   this Supreme Court that the testimony he gave at trial about entering
27   the house and the series of events leading up to and including what took
28   place in Sara's room was indeed "filled with falsehoods and garbage" as
29   correctly stated by the prosecuting attorney at closing arguments. (See,
30   infra at (k), and post at Ground for Relief 3.)

31       However, merely to explain, not to try to excuse, what motivated him
32   to be dishonest at trial, Petitioner asks the Court to consider that in
33   the nine months or so before his trial began, he had read several of
34   Sara's reported statements to detectives wherein not only did Sara
35   falsely allege certain things that did not happen that night in her room
36   but also she left out several important things that actually did happen.
37   As a result, Petitioner was able to delude himself into believing that
38   he was going to be acquitted once all of Sara's lies, inconsistencies,

and omissions were exposed to the jury at trial and somehow be shown to **justify** everything that happened that night after he left Bobby McGee's.

But after hearing **consistent and convincing** testimony from Ed Van Bebber, the Cordells, and even from Sara herself that Sara had **not** been inside Bobby McGee's at all that night, Petitioner came to the sickening realization that he had committed a **gross** series of transgressions in the early morning hours of 11/22/92 against a woman **other than** the one he had met and spoken with just a short while earlier inside Bobby McGee's.

Thus the testimony that Petitioner subsequently gave at trial arose from Petitioner's instinct to survive the persecution he was under by not only the People of the State of California but also the completely shattered image he once had of himself as a good and decent human being. Moreover, Petitioner imagined that testifying as he did would help compensate his resulting loss of confidence in the defensibility of **anything** that had happened that night with Sara as well as all the ineffective assistance he believed he was receiving from attorney Higgins. (See, supra at 2(e), infra at 3(f), and post at Ground for Relief 2.)

However, not even Petitioner's instinctual attempt at self-preservation while on the witness stand would let him lie about whether Sara was the same woman he had met earlier that night inside Bobby McGee's. For at the outset of being questioned by both the defense and the prosecution, Petitioner hesitantly admitted he just did not know. (RT 634, 724-27.) Recognizing the damage that such an admission by Petitioner had done, attending newspaper reporters ran the following:

> By T.G. Swauger, The Union, 8/26/93
>
> ....[I]n a surprising admission, K'nAPP said he was not absolutely certain that the woman who had testified against him last week -- the woman he followed -- was indeed the woman he had spoken to in Bobby McGee's.
> "At the time it was her. The frame of mind I was in, it was her," he said. "But today, I'm not certain it was her." ...

> By Tamara Chuang, The Union, 8/31/93
>
> ....K'nAPP's own testimony at times appeared to damage his case -- particularly when he said he was uncertain if he followed the wrong woman home that November night.

23

**(e) Testimony of Charlene case (Counts 13-15):**

Charlene's Testimony

Charlene testified that in the early afternoon of 8/4/91, Double Deal Pizza was paying her to hang promotional doorknob flyers near Citrus Heights. (RT 439-40.) Rather than distribute all the flyers she had been given, Charlene threw many away into a dumpster as she walked behind a travel agency. (RT 443.) Moments later, a man identifying himself as "Pat" drove up and confronted her about dumping the flyers. Charlene told the man to mind his own business and began to walk away. (RT 446.)

Charlene said the man told her he was from Double Deal Pizza's "corporate office" and was going to report her to her store's manager for discarding the flyers that he had since retrieved and had in the car with him. (RT 451-53.) Worried she could lose her job, Charlene pleaded with the man to not tell, told him she was hot and thirsty, and then accepted when he offered to buy her a soda and let her cool off inside his air-conditioned car. (RT 452-56.)

After buying Charlene a soda, the man drove around the area discussing with her whether or not he should report her. (RT 456-58.) At one point Charlene said the man parked his car, commented on her looks, and asked about taking her out sometime. (RT 459.) She said that upon her offer of a hug instead, the man pulled her to him and kissed her on the cheek. (RT 460.) She also said the man parked next to a dumpster behind a store, got out of the car with her still inside, dropped the flyers into the dumpster, and then returned to but got back out of his car and retrieved the flyers from inside the dumpster when Charlene told him she then felt guilty about having thrown them away in the first place. (RT 460-61.) She said the man then told her she could finish hanging the rest of her flyers wherever she wanted. (RT 461.)

Charlene said the man then drove her where she told him to and parked along the curb next to a house later learned to owned by a woman named Susan Runkle. (RT 349-50, 462.) But as she was about to get out of the car, Charlene said the man asked to see and touch her breasts. (RT 463.) When she told him no, Charlene said the man pulled her to him and touched them anyway, whereupon she said he also digitally penetrated her vagina twice and her rectum once. (RT 464-67.) (However, Charlene also testified that the man's finger going into her anus and then a second time into her vagina was "actually a mistake" caused by her "wiggling and trying to get away"; she said the man had neither attempted nor

meant to penetrate her rectum and had tried to insert his finger into her vagina the second time only because it had slipped out while she was squirming around [RT 520-21].)

Charlene testified that the man finally released her and drove away when she started reaching for the horn button on his steering wheel. (RT 470-71.) She then went to the nearby house and told Susan Runkle what had happened. (RT 353, 471.)

### Petitioner's Testimony

In accordance with the reprimand he had received earlier from within the Office of the Sacramento County Public Defender (see, supra at 1(a)), Petitioner merely testified that he was not the man whose car Charlene had gotten into on 8/4/91. (RT 615; but see, supra at 1(a), infra at H, and post at Grounds for Relief 1 through 6.)

### (f) Performance of defense counsel:

In the months and weeks before his trial began, Petitioner mailed to attorney Dennis Higgins (supra at 2(c), 2(e), and 2(f)) many detailed notes rebutting and otherwise addressing every investigation report provided by investigators for the defense and prosecution. However, attorney Higgins put minimal effort into defending Petitioner at trial against the prosecution's witnesses and evidence.

For example, when Petitioner pleaded with Higgins to question Sara about the many lies, inconsistencies, and ommissions Petitioner had noted in what Sara had testified to at trial and what she had initially told detectives (see, supra at (d)), Higgins refused, telling Petitioner that during deliberations the jury was going to thoroughly review a complete transcript of Sara's testimony and would be smart enough to figure it all out for themselves. He also told Petitioner that the members of the jury -- especially the eight women -- would certainly become angry at him and feel sorry for Sara if he were to openly attack every weakness in Sara's testimony and make her seem too uncomfortable on the witness stand.

In another example, when Petitioner pleaded with Higgins to introduce one of the earlier recorded statements Sara had given to detectives wherein she admits that she herself had initiated the final sex act -- i.e., orally copulating Petitioner to orgasm -- Higgins refused and said the judge would not allow it in even if he were to try.

Further, after Sara's testimony on direct examination that she had removed her contact lenses before getting into bed, and that she

25

initially thought Petitioner was a boyfriend of hers named Jesse **until she saw the blue of Petitioner's eyes** (RT 120), Higgins ignored Petitioner's pleas to cross-examine Sara about her many inconsistent statements as to when exactly her bedside lamp got switched on after Petitioner's entrance into her completely darkened room. (RT 180-84.)

Additionally, following Sara's testimony that she had not suffered any type of physical pain or discomfort either during or as a result of the alleged events in her room with Petitioner, Higgins denied Petitioner's requests that he make the prosecution's expert witness answer whether the jury should find it suspicious or expected that a woman as fearful as Sara allegedly was either could or would have been sufficiently relaxed and lubricated enough that not even one of the many penetrations charged against Petitioner had caused her even the slightest bit of physical discomfort.

Higgins also refused to get that same expert witness to state whether a slightly reddened area he said he had observed at the opening of Sara's vagina could have been caused by the **oral** sex that Petitioner has always admitted took place rather than by the falsely alleged intercourse that Petitioner maintains he was simply **not** able to actually accomplish because of how intoxicated he was.

Then, while questioning Petitioner on direct examination, Higgins blatantly revealed to the jury that Petitioner was and had been in custody ever since his arrest nine months earlier. (RT 608.)

Moreover, when Lynn Rominger, one of the several women Petitioner had gotten involved with after he and his wife split up (see, supra at A), was allowed to give false and uncorroborated "stalking" testimony against Petitioner as "propensity" evidence, Higgins refused to challenge, impeach, or otherwise even try to discredit Rominger's vindictive allegations pursuant to Petitioner's pretrial notes. (See, RT 904-05; see also, infra at K, and post at Grounds for Relief 2 to 6.)

Nor did Higgins let any of Petitioner's desired witnesses testify on Petitioner's behalf at trial. Such witnesses would have given testimony that could have rebutted and even discredited at least some of the prosecution's witnesses, and definitely would have established the events and circumstances leading up to and resulting in Petitioner's mental state just prior to and including his bad decisions and acts regarding Sara the night of 11/21/92, which would have been relevant at least toward mitigation at sentencing.

26

**(g) Excerpts from recorded visit conversations:**

The prosecution was allowed to let the jury hear and read several, albeit brief, portions of the recorded visit conversations Petitioner had with one of his girlfriends at the jail on 12/10/92 and 12/14/92. (See, supra at 1(a); see also, RT 658, 663; and Clerk's Augmented Transcript on Appeal.)

However, the selected excerpts did not provide the content or the context of what had been said to or by Petitioner either before or after each portion revealed to the jury.

Moreover, the jury did not get to hear from those same recorded conversations the many portions that actually corroborate Petitioner's testimony at trial and showed Petitioner very early on taking responsibility for his actions and expressing remorse for what had taken place at Sara's house on 11/22/92. (See, post at Grounds for Relief 2 through 6.)

**(h) Petitioner's forced wearing of "ski mask" during testimony:**

When Petitioner took the stand to testify on his own behalf, the prosecutor requested and the judge ordered that Petitioner put on the balaclava he had worn into Sara's bedroom on 11/22/92. (RT 661, 824-25.) One of the area's major newspapers gave the following account of what effect this particular event had on Petitioner's jury:

### Rape trial turns ugly

By T.G. Swauger, The Union, 8/26/93

K'nAPP was forced to don his black wool ski mask before the jury.

"I don't want to put it on. I don't see any reason to put it on," K'nAPP said before the judge ordered him to place the mask on his head. "I think this is sealing my fate by putting it on, sir -- only because it's allowing the jury a chance to get a biased, prejudicial view of something."

Being able to see only his eyes and mouth, the panel of eight women and four men were **transfixed** by the hooded K'nAPP for several seconds before the judge allowed him to remove the garment.

**(i) Emotional outburst of prejudicial information in court (RT 825-27):**

Immediately after Petitioner was allowed to remove the above mask, the judge abruptly and angrily ordered the bailiff to remove Petitioner's mother from the courtroom. (RT 825.) As the bailiff approached, Petitioner's mother leaped to her feet and shouted, "What!

1   Are you going to put me in jail because you're putting my kid in jail
2   for **169 years** for **three rapes** he didn't commit?! Go ahead!" (Id.) The
3   bailiff and prosecuting attorney's investigator then twisted up her arms
4   behind her back and dragged her kicking and screaming all the way from
5   the first row of the gallery out into the hallway. The next day's
6   newspaper articles related the incident as follows:

7                    **Mother held for disrupting son's trial**

8                  By Ramon Coronado, The Sacramento Bee, 8/26/93

9                        The mother of Eric Charles Rodney K'nAPP ...
10              was arrested on contempt of court charges
                Wednesday for once again disrupting her son's
11              trial.
                       "What are you going to do? Put me in jail?"
12              shouted an angry Barbara Bird after a judge
13              ordered her removed from the court.
                       "You're putting my kid in jail for 169 years
14              for three rapes he didn't commit. Go ahead,"
15              Bird yelled at the judge in front of stunned
                jurors.
16                     K'nAPP, testifying for the second day, began
17              to cry as he saw his mother being dragged by the
                back of her dress by a bailiff.
18                     ....The outburst marked the second time
19              Sacramento Superior Court Judge Kenneth G.
                Peterson admonished Bird during the trial, which
20              began last week.
                       On Wednesday, after excusing the jury early
21              when one woman juror insisted the incident left
22              her shaken and unable to continue, Peterson held
23              a contempt of court hearing for Bird....

24   **(j) Mistrial motions:**

25       Prior to the above disruption of trial proceedings, the jury heard
26   testimony from Charlene and a detective named Richard Carlson that was
27   highly suggestive as to Petitioner being suspected of and charged in yet
28   **another** sex crime extrinsic to the present trial (RT 492, 581, 583-85)
29   -- i.e., the Count 16 Barbara rape case. (See, supra at 1(a), 2(a),
30   2(b), 2(g), and 3(i); see also, infra at D.2, and post at Grounds for
31   Relief 2 through 5.)

32       In addressing this problem after the fact, Judge Peterson stated the
33   following:

34                  I'm absolutely **not** convinced there was no
35              danger the jury would think there's some other
                alleged victim.
36                  But the questions asked about looking through
37              some other MO and that type of thing, all of
                that comes through, suggesting there was **more**
38              than [just] these two persons [Sara and

                                28

> Charlene] and that is highly prejudicial to the
> effect I want to make sure, Mr. Carlson, you are
> not volunteering information to suggest there
> were other persons. And I want to caution you,
> Mr. Higgins, it now appears to me those people
> were there and may well have known. I want to
> make sure it's on the record, those questions
> are framed that might call for a defense that
> might be answered with regards to Barbara G. in
> view of the lineup interview, such that might
> prejudice this jury.
>
> (RT 589, lines 14-27.)

Moreover, Petitioner's attorney then stated the following when he was invited to speak on the matter:

> I was making a note to call for a mistrial
> based on what the officer's already said. He
> said there was another victim reported [Barbara]
> and said "those victims" wanted my client to not
> make any statement during the lineup. I don't
> think it could be any clearer [to the jury that]
> there could be a third victim [Barbara].
>
> (RT 590, lines 1-6.)

However, even after stating that the testimony of Charlene and Detective Carlson "was perilously close" to prejudicing Petitioner's jury (RT 590, line 11), the judge allowed the trial to proceed.

But then, following the above outburst by Petitioner's mother, Petitioner's attorney made a second motion for mistrial:

> [A]t this time I would make a new motion for
> a mistrial. During my earlier motion the Court
> had stated itself that when the detective talked
> about the interview with Barbara [] and Charlene
> [] in his office with Detective Carlson, I
> thought it became clear to the jury there was,
> in fact, a third victim [beside Charlene and
> Sara]. Court thought it was "perilously close"
> but unclear enough to where the jury wouldn't
> know about it.
> I think after Ms. Bird's statements in front
> of the entire jury yesterday, I think that that
> "perilously close" is gone; it's crossed the
> line and the jury now knows there is a third
> case [regarding Barbara]. And the knowledge of a
> third case now before them is going to be
> prejudicial to my client and make it impossible
> for him to get fair deliberations and a fair
> trial.
>
> (RT 849-50.)

///
///
///

29

1   As a result of the second mistrial motion by Petitioner's attorney,
2   the judge questioned each jury member one at a time outside the presence
3   of the others to determine the extent of what each had seen and heard.
4   (RT 853 to 882.)

5   Two jurors, both of whom are women, admitted to having learned from
6   the outburst by Petitioner's mother that Petitioner had **at least** one
7   other rape case pending against him outside the present proceedings. (RT
8   871, 878.) One of these two women, juror Connie Mahoney, was an older
9   woman who expressed frustrated displeasure with what she had learned
10  while serving on other juries in the past about defendants having other
11  crimes charged against them that jury members do not get told about at
12  trial. (RT 872-75.)

13  Additionally, at least **nine** jury members admitted that the outburst
14  revealed to them the potential sentence Petitioner was facing in prison
15  upon conviction. (RT 854-83.)

16  However, despite the above, not only did the judge fail to grant a
17  mistrial, but also Petitioner's attorney withdrew from both motions for
18  mistrial. (RT 883.)

19  **(k) Closing statements:**

20  By the Prosecution (RT 940-1000, 1039-53)

21  The prosecutor delivered a highly prejudicial closing statement that:
22  (i) improperly lambasted, impugned, and otherwise disparaged both
23  Petitioner and Petitioner's attorney (RT 1040, 1043-44, 1052); (ii)
24  personally **vouched** for the credibility of both Sara and Charlene in
25  their respective testimonies at trial (see, e.g., RT 963-66: "Honesty,
26  it was just coming out of her [Charlene's] ears" "because she's so
27  darned determined to be honest with you that she's going to tell you
28  everything"); and (iii) otherwise exerted **undue influence** over the minds
29  of the jury members by telling them how they "should" **feel** "absolutely
30  repulsed and offended" against Petitioner, Petitioner's attorney, and
31  what Petitioner was accused of doing (RT 1040, 1044, 1052).

32  The prosecutor also pointed at and repeatedly called Petitioner
33  "liar" (RT 949, 985, 996, and 1041-44) and "monster" (RT 1052).

34  He told the jury that Petitioner would have been more credible if he
35  had testified that "Martians" as "alien invaders" in "an alien spaceship
36  had come over his apartment, hovered over and he was caught up in a
37  tractor beam that took him over to Sara's house and beamed him down into
38  Sara's room with a ski mask and knife." (RT 980, 996.)

30

He said that Petitioner "told you huge, monstrous, whopping lies" "like some kind of huge blob in the courtroom, some huge monster, like The Thing." (RT 985, 1043.)

The following is an excerpt from one of the newspaper articles that ran the next day about the prosecutor's closing statements:

### Serial rape rap on K'nAPP nearing a wrap

By T.G. Swauger, The Union, 8/27/93

> Closing arguments began Thursday in the **serial** rape trial of ... Eric Charles Rodney K'nAPP as the prosecution shed light on what it called the mind of a rapist.
>
> [The prosecutor] called K'nAPP's story filled with "falsehoods and garbage." He suggested K'nAPP would have been better served to tell the jury he was kidnapped by aliens who beamed him over to the woman's home with a ski mask and knife.

### By the Defense (RT 1000-1039)

After the prosecution's above closing statements had sufficiently kindled flames of passion and prejudice even further against Petitioner in the hearts and minds of the jury, Petitioner's attorney then fanned those flames into a roaring inferno as follows.

When the prosecutor concluded his closing statement to the jury just before the court announced noon recess, Petitioner's attorney, Dennis Higgins, told Petitioner that he had thought the prosecution's close was going to last longer and thus have given Higgins all that evening and possibly even the coming weekend to prepare his closing statement.

Following the noon recess, attorney Higgins told Petitioner that he had "just now worked through my entire lunch writing out my closing statement." Higgins stated that although Petitioner was probably not going to like what he was about to hear in that hastily prepared statement, its anticipated effect on the jury was nevertheless going to be in Petitioner's best interest.

Higgins then delivered in dull monotone a rambling statement of at least 30 minutes wherein he talked about making investments and told the jury that Petitioner had indeed lied as alleged by the prosecutor. He told the jury that "certain portions of my client's testimony are ridiculous, and they are ridiculous because they are an attempt by my client to cover everything. (RT 1002-05, 1016.) He said that much of Petitioner's testimony was false because Petitioner was scared. (RT 1003.)

Higgins used the word "tramp" at least four times in connection with Sara's name (RT 1007, 1026, 1040), and used the term **"serial rapist"** at least 12 times in relation to Petitioner (RT 1002, 1004-06, 1023-24, 1026-27) in spite of the fact that the **only** "rape" Petitioner was on trial for was that charged against him in the **Sara** case. (Not even the prosecutor had ever referred to Petitioner in court as a "serial rapist" [although the prosecutor **did** make such allegations to the general public by and through the media (see, supra at 2(a), and post at Ground for Relief 3)].)

Additionally, Higgins **again** revealed to the jury that Petitioner was and had been in jail ever since his arrest nine months earlier. (RT 1002, 1035; see also, supra at (f) [page 24].)

Moreover, Higgins told the jury that Petitioner's access to discovery before trial as well as Petitioner's constant presence in court during trial had made it possible for Petitioner to tailor his testimony around everything presented against him before giving his testimony. (RT 1002-06.)

The following excerpt is from one of the newspaper articles that ran the next day about the closing statement given by attorney Higgins supposedly "on behalf of" Petitioner:

### SERIAL rape trial now waits for verdict

By T.G. Swauger, The Union, 8/28/93

The jury in the **SERIAL** rape trial of Eric Charles Rodney K'nAPP takes control of the case now after hearing final arguments by K'nAPP's defense attorney who **distanced** his client from his own testimony.
"The district attorney tried to tell you that certain portions of my client's testimony is ridiculous. It **is** ridiculous because my client is trying to cover everything," attorney Dennis Higgins said. He said K'nAPP only **molded** the truth to make it more believable.

## 4. Significant Events after Trial

### (a) Concluding instructions, case to jury (CT 110, RT 914-940):

Prior to and after the above closing statements were given by the prosecution and defense, Petitioner's jury received a final set of instructions before Petitioner's case was given to them for final deliberation. Petitioner contends that of the instructions given, the following are relevant to his later contention and argument herein (see, post at § IV and Ground for Relief 4) that his jury was not properly

instructed:

      2.01   Sufficiency of Circumstantial Evidence;

      4.20   Voluntary Intoxication, Not a Defense;

      4.21   Voluntary Intoxication, Specific Intent;

      4.22   Voluntary Intoxication, Defined;

      10.60 Corroboration.

**(b) Prejudicial publicity:**

As previously stated herein (see, supra at 2(a), 3(a), and 3(h) to 3(k)), employees of the Sacramento County Sheriff's Department and Office of the District Attorney caused the major newspapers of Sacramento County to publish many false and highly inflammatory articles about Petitioner while Petitioner was in jail and throughout the course of Petitioner's trial.

Out of eight or so such articles that were printed during Petitioner's trial, at least **four** went out to the public **just before** and **during** the 2-day weekend that Petitioner's **unsequestered** jury members were allowed to spend at home right after receiving Petitioner's case the afternoon of 8/27/93. (See, supra.)

**(c) Jury's verdict (CT 111-42; RT 1062-70):**

On Monday, August 30, 1993, Petitioner's jury returned to court after the 2-day weekend they had been allowed to spend at home immediately after receiving Petitioner's case the previous Friday.

During a very brief deliberation, the jury asked the judge in writing (CT 143) to clarify which of the two counts of rape charged against Petitioner related to the time that Sara had said Petitioner made her sit on his lap. (See, supra at 3(d) [page 20].)

However, following the judge's essentially **nonresponsive** "answer" (CT 144), the jury decided to just go ahead and declare Petitioner guilty of **every** count and weapon enhancement charged against him rather than deliberate any further with respect to any specific count(s) they were apparently **not** convinced beyond reasonable doubt that he had committed.

Additionally, Petitioner was not found guilty of Count 9 (see, supra at 1(c)) because that particular count was dismissed during trial when Sara's testimony failed to support it. (CT 109.)

**(d) Nonperformance of trial attorney:**

From Petitioner's early teens until well after the time of his arrest on 11/22/92 (see, supra at A), Petitioner had always been reluctant to let others know anything too personal about what his life was like

33

growing up for fear that he would be ridiculed, ostracized, or found unsuitable for military service or a career in law enforcement. (Id.)

As a result, Petitioner became so practiced at always trying to prevent others from thinking anything might be wrong with him that he eventually found it practically impossible to admit even to himself that he did in fact have certain weaknesses and shortcomings common to many other people that professional intervention could have helped him learn to manage and overcome without suffering any negative social stigma.

Accordingly, after Petitioner was arrested in the Sara case on 11/22/92 (supra at B.1), and **especially** after he was reprimanded by the deputy public defender assigned to represent him and was thereafter **falsely** charged in the Charlene and Barbara cases (see, supra at 1(a) [page 12]), Petitioner did not disclose very much "sensitive" information about himself either to the deputy public defender or to his subsequent attorney Dennis Higgins.

But after the horrid realization he had come to at trial that Sara was most likely **not** the same woman he had met inside Bobby McGee's earlier on 11/21/92 (see, supra at 3(d) [page 23]), Petitioner felt so haunted that he began a **lot** of deep soul-searching and heavy self-analysis that caused him to take a brutally honest inventory of his life in an attempt to discover where and how his life had gotten so off-track that what had happened that night with Sara had become even remotely possible.

The process of self-comprehension that Petitioner began to impose upon himself also led him to finally open up to attorney Higgins and be completely candid about everything he had until then not disclosed about his life history up to and including what had happened with Sara on 11/22/92. However, Higgins said he was not interested in anything Petitioner had to tell him at that point because "it's completely irrelevant now that your trial's over and, besides, I only get a fraction of what my time is actually worth, and that is to represent you through one trial **only**."

### (e) Change of counsel for new trial motion, sentencing:

While in jail near the latter part of 1993 waiting to be sentenced, Petitioner was visited by an attorney named James T. Locke, who said he knew all about Petitioner's case and wanted to help Petitioner get a new trial. As a result, Locke substituted in as Petitioner's counsel of record as soon as Petitioner's mother was able to borrow Locke's requested fee from family. (However, although Locke had represented

34

himself to Petitioner and Petitioner's mother as an experienced criminal lawyer, Locke later confessed that he had lied in order to get the fee and gain experience as counsel in a criminal matter.)

But the trial judge, K.G. PETERSON, eventually denied Locke's motion for new trial after refusing to provide Locke with a free transcript of prior proceedings in Petitioner's case.

As a result, attorney Locke became very perplexed at having to then represent Petitioner at sentencing. He refused to subpoena or interview **any** character witnesses for Petitioner, telling Petitioner that to do so was unnecessary and too expensive.

Moreover, when the prosecution **again** called Lynn Rominger to **falsely** testify against Petitioner (see, <u>supra</u> at 3(f) [page 26, 5th ¶]; see also, <u>infra</u> at K, and <u>post</u> at Grounds for Relief 2 through 6), attorney Locke, just like attorney Higgins had done before him (<u>id.</u>), failed to challenge, discredit, or otherwise even try to impeach Rominger's **false** and uncorroborated testimony.

**(f) Sentencing (RT 1363–81):**

On February 18, 1994, Petitioner was sentenced to an aggregate term of 98 years in state prison on the 14 enhanced counts in the two separate cases concerning Sara and Charlene. (CT 318-19; see also, <u>supra</u> at 1(c) [page 13] and 4(c) [page 33].)

In the Sara case, the judge selected Count 10 as the base offense and imposed a 4-year upper term and 1-year enhancement for the alleged touching of Sara's breasts on 11/21/92. (5 years total.) He then gave Petitioner 6-year middle terms each on Count 1 through Count 8, and 4-year middle terms on each count's weapon enhancment. (Thus netting Petitioner a total of **85 years** just for the quick succession of various sex acts he allegedly committed against Sara on 11/22/92 solely for the purpose of achieving his and Sara's sexual gratification.)

In the Charlene case, the judge sentenced Petitioner to 3 years on Count 13 –– two thirds of which was stayed pursuant to Penal Code § 654 –– and 6-year terms each on Counts 14 and 15. (Thus netting Petitioner a total of 13 years in the **falsely charged** Charlene case [for a combined total of **98 years** in the two separate, unrelated, but joined cases concerning Sara and Charlene].)

The judge ordered Petitioner's sentence to be served consecutively per Penal Code § 667.6 rather than concurrently per Penal Code § 1170.1. He also imposed a $10,000 victim restitution fine against Petitioner

without conducting any type of hearing to determine either what monetary loss was actually suffered by either Sara or Charlene or Petitioner's poverty and ability to pay.

In arriving at Petitioner's above sentence and fine of victim restitution, Judge PETERSON relied only upon his own **personal** assessments of alleged aggravating factors in Petitioner's case.

Thus Petitioner's sentence was based **solely** on Judge PETERSON's following mere **presumptions** (emphases added) rather than upon any existing or otherwise **actual** facts that had been either charged against Petitioner, submitted to Petitioner's jury, or proved against Petitioner beyond a reasonable doubt as guaranteed by Amendments VI and XIV to the U.S. Constitution:

> **The Court** rules that the applicability of Penal Code Section 667.6, subdivision (c), **is** appropriate and necessary for **proper** sentencing in this case [regarding Sara on 11/22/92]. The **nature** of this event, the **high degree of callousness** involved, **threats** [], **clear planning** that **went on** in this case because of the presence of the ski mask, and **stalking** that **I** find **did** occur here, .... [RT 1365.]

> [I]n **my** discretion, **I** believe and feel strongly that the provisions of Penal Code Section 1170.1 are **not** applicable and **inappropriate and insufficient** to protect society sufficiently from persons who commit the nature of the crimes committed here. [RT 1366.]

> [A]nd whether I am required to or not, in **my** judgment justice **requires** that the [knife] enhancement be imposed as to each of the sexual offenses[.] [RT 1367.]

> Under Rule 421 of the Rules of Court[,] **I** do find that **three** of the **specific** circumstances in aggravation **have** been demonstrated in this case. Under subdivision (a)(1), **I** do find that the **great violence** that **occurred** here through the **threats** of great bodily injury do disclose **great callousness** which **is** properly considered a circumstance in aggravation. [RT 1367.]

36

**Certainly** there **were** those threats to the victim and the victim's family. [RT 1368.]

[C]**learly** there is **no** argument here that **callousness** was **not** demonstrated by the **threats** of harm[.] [RT 1368.]

Further, I find that Rule 421, subdivision (a)(3), circumstances in aggravation regarding **vulnerability** is **without question** clear and present in this case. [RT 1368.]

[T]here could **not** be a **more** vulnerable person than one who is alone in their bed at night preparing to go to sleep[.] [RT 1368-69.]

Further, I find that aggravation **is** proved by Rule 421, subdivision (a)(8), that the **planning** in this case **has** been **proved.** [RT 1369.]

[G]**reat planning was** shown here by **stalking** the victim [Sara] home that evening and **perhaps on other evenings.** [RT 1369 (a **completely** out-of-the-blue insinuation).]

[C]**learly** he [Petitioner] **did** follow her [Sara,] **planning** to attack her, parked around the corner **planning** to attack her, **waited** until there's sufficient opportunity to enter her room when the lights were .... [RT 1370.]

All of those various stages of **planning clearly** give an opportunity for Mr. K'nAPP at any time to have stopped his conduct, turned around and left without committing this crime, and it just added to the **planning,** added to the **aggravation** of this **not** being the type of **spontaneous** acts or **unplanned** act that would in **any** way mitigate what he did. If there were **ever** any doubt about his **willingness** to **plan and stalk** someone and **follow** them **to commit** a crime, I think the testimony of Ms. Rom[in]ger here today and at the trial itself [see, <u>supra</u> at 3(f) [page 26, 5th ¶] and 4(e) [page 35]; see also, <u>infra</u> at K, and <u>post</u> at Grounds for Relief

2 through 6] **clearly shows** he [Petitioner] is not only **capable** of doing that type of **stalking and planning**, but he **has** actually **done it not only** on **this** occasion **but** [**also**] on **other** occasions. [RT 1370.]

In the Rom[in]ger case, though there **was** a **threat**, there was no violent criminal physical acts that took place, but it **does** demonstrate he [Petitioner] **has** the **ability and willingness** to do that type of planning; and he **did** it in **this** particular crime [regarding Sara] in that the activity by -- Ms. Rom[in]ger **confirmed** in the particular crime. [RT 1370-71.]

**I** find that the **method** of approaching [Sara's] house and **deciding** to do what he did caused the aggravating circumstances to substantially **outweigh** the mitigating circumstance of his lack of record and productive life. **That** is what is aggravating about this crime [regarding Sara] as a whole, that **it was so planned**, that **it was so full of threat**[,] and the **callousness**[,] and the victim **was so vulnerable.** [RT 1374-75.]

The **other aggravating aspect** of it is that there **is** a **multiplicity** of events. [RT 1375.]

[T]he **consecutive** sentence rather than **concurrent** sentences are -- imposed **does** cause as to most of the counts to have the balance of the aggravating circumstances and mitigating circumstances be **equal.** [RT 1375.]

In addition to the prison term, the Court is required to order a restitution fine pursuant to Government Code Section 11967 of no less than $200 and no more than $10,000. ... In view of the -- the Court must set the restitution fine based on two factors; seriousness of the crime and the ability of the defendant to pay. The defendant is 26 years old, clearly is an

1

2

3

4

5

6

7

8

9

> able-bodied individual. It's **clear** he **will** be
> able to work while he's in prison. Court orders
> the collection of the restitution fine pursuant
> to Government Code Section 2085.5, and in view
> of the extremely long time that the defendant
> will be serving in prison and his able-
> bodiedness, Court **feels** he **has** the ability to
> pay the maximum restitution fine of $10,000, and
> doe so order. [RT 1381.]

10

11

12

13

14

15

16

17

18

19

It was also at this point in time after Petitioner had been **falsely** charged in the Barbara rape case more than a year earlier (see, supra at 1(b) [page 12]), that the judge finally **dismissed** that sole extrinsic rape charge and weapon enhancement which the Sacramento County Sheriff's Department and Office of the District Attorney had thus far been using to manipulate the area's major newspapers into publishing at least 20 inflammatory articles wherein Petitioner was **falsely** labeled **"serial rapist"** prior to and throughout his trial. (See, supra at 2(a) [page 13], 3(a) [page 17], 3(k) [pages 31 and 32], and 4(b) [page 39]; see also, infra at 8,a and post at Grounds for Relief 2 through 6.)

20 **C. Direct appeal, C017988, California Court of Appeal, Third District.**

21

22

23

After Petitioner was convicted and sentenced (supra), appellate counsel Ross Thomas was appointed by the Court of Appeal to represent Petitioner on direct appeal.

24

25

26

Over the next several months after attorney Thomas was appointed on 6/10/94, Petitioner sent Thomas at least 15 letters providing full disclosure of all facts and information thus far set forth herein. (Supra at A and B.)

27

28

29

30

31

32

33

34

35

However, the Appellant's Opening Brief that attorney Thomas eventually filed on Petitioner's behalf only addressed (1) the trial court's failure to sever the weaker Charlene sexual assault case from the stronger Sara rape case (supra at B.2(g) [page 16]); (2) CalJIC 2.21.2 lessening the prosecution's burden of proof (supra at B.3(c) [page 18]); (3) the trial court's forcing of Petitioner to wear the mask while on the witness stand (supra at B.3(h) [page 27]); and (4) CalJIC 2.01 undermining Petitioner's constitutional right to the "proof beyond reasonable doubt" standard in being convicted (supra at B.4(a) [page 32]).

36

37

38

On October 6, 1995, the appellate court denied Petitioner's entire appeal in an unpublished opinion.                                                      California

Accordingly, attorney Thomas filed a Petition for Review in the Supreme

1 | Court, but **only** on the fourth enumerated issue above concerning CalJIC 2.01.

2 | On December 22, 1995, however, the California Supreme Court declined to grant review

3 | of even that particular issue.

4 | **D. Petitioner's first few years in prison.**

5 | 1. Initial Events, Circumstances, and Conditions of Confinement

6 | After Petitioner was convicted on August 30, 1993 (supra at B.4(c) [page

7 | 32]), his trial attorney, Dennis Higgins, told him he should not talk about

8 | any of his former work as a Counterdrug peace officer when being interviewed

9 | for the presentence probation officer's report. Higgins promised that

10 | Petitioner would "live longer in prison if you don't tell anyone about your

11 | work in law enforcement."

12 | But that "advice" from attorney Higgins caused Petitioner a **long** period

13 | of immeasurable hardship and suffering following his arrival in the

14 | California prison system on 3/17/94, for while he had been inside the jail

15 | since 11/22/92, prisoners throughout the State had been following his case

16 | by reading the many inflammatory newspaper articles that both **falsely**

17 | referred to Petitioner as a **"serial** rapist" (see, supra at B.2(a) [page 13],

18 | B.3(a) [page 17], B.3(k) [pages 31 and 38], and B.4(b) [page 33]) and

19 | discussed Petitioner's past ties with law enforcement as a Counterdrug peace

20 | officer.

21 | Because of such knowledge among the general population of prisoners,

22 | Petitioner was repeatedly beaten, raped, stabbed, and otherwise forced to

23 | live in constant fear for his life while desperately trying to make

24 | callously indifferent prison officials aware that he was a former peace

25 | officer needing to be protected against assault from other prisoners.

26 | On August 28, 1994, for example, Petitioner suffered a particularly

27 | heinous ordeal that has since left him knowing all too well what it means to

28 | be a terrorized and powerless victim of a physically and mentally very

29 | painful sexual invasion.

30 | Moreover, not only was Petitioner physically and psychologically

31 | brutalized by other prisoners for being a former peace officer and convicted

32 | sex offender, but also he was severely harassed and retaliated against by

33 | guards and other prison personnel, especially after he and his mother began

34 | exercising their First Amendment right to advocate for accountability and

35 | reform within the California prison system. (See, e.g., ante at § II.J [page

36 | 6]; see also, lunion1.com.)

37 | However, a positive result of everything Petitioner survived the first

38 | year of his imprisonment is that he surrendered himself to God's will in the

prison chapel on 9/11/94 and thereafter devoted himself to the self-help work he had begun in 1993 following trial. (See, supra at B.3(d) [page 23] and B.4(d) [pages 33 and 34].)

The work Petitioner did on himself those first few years in prison gave him such a deep and passionate sense of purpose and meaning that he somehow found the strength and courage to stay alive in spite of his surrounding circumstances.

## 2. Discovery of Withheld Exculpatory Evidence

When attorney Ross Thomas was appointed by the appellate court to represent Petitioner on appeal (supra at C), he requested all the case material that each of Petitioner's previous attorneys had accumulated before, during, and after Petitioner's trial. Then, after Petitioner's appeal was denied, Thomas mailed to Petitioner all such case material that he had thus received from Petitioner's previous attorneys. However, the **several** boxes of **unorganized** material had to be immediately put in storage at the prison because of the life-threatening and otherwise dangerous conditions of Petitioner's confinement at the time. (Supra.)

But in June of 1997, after finally getting himself safely housed in protective custody at another prison more than a year later, Petitioner was at last able to access and sort through his several boxes of material related to his criminal conviction, whereupon he discovered many documents that neither his previous attorneys nor the Sacramento County Sheriff's Department or Office of the District Attorney had ever revealed to him or even mentioned were in existence.

Upon reading the documents for the first time ever in 1997, Petitioner learned that before he had ever even been additionally charged in the separate cases involving Charlene and Barbara (see, supra at B.1 [pages 11-13]), both the prosecution **and** the defense had been in **physical** possession of several reports demonstrating Petitioner's **actual innocence** in the Barbara rape case.

More specifically, Petitioner discovered a 10-page report generated in January of 1992 from within the Sacramento County Sheriff's Department wherein a female eyewitness -- in fact a **second** victim of Barbara's attacker -- **positively** identifies her **and** Barbara's attacker as (1) being at least five inches **taller** and 35 pounds **heavier** than Petitioner; (2) having a noticeable scar across the bridge of his nose that Petitioner does **not** have; (3) having hair that is neither the **same** color, length, **nor** texture as Petitioner's; (4) having eyes a completely **different** color than

1  Petitioner's; (5) wearing clothing of a type **never** owned by Petitioner; and
2  (6) driving a car completely **different** in type, color, make, **and** model than
3  Petitioner's. (See, post at Grounds for Relief 2 through 6 [and exhibit(s)
4  referenced therein].)

5  ## 3. Hiring Attorney for Relief on Habeas Corpus

6      Immediately after Petitioner discovered in June of 1997 the exculpatory
7  evidence that had been illegally withheld from him in the Barbara rape case
8  and prejudicially allowed to remain pending against him before, during, and
9  after his unrelated trial (see, supra at B.1(a) [page ¡2], B.2(a) [page ¡3],
10 B.2(b) [page ¡3], B.2(e) [page ¡5], B.3(a) [page ¡7], B.3(i) [page 27],
11 B.3(j) [page 28-30], B.3(k) [pages 31-32], B.4(b) [page 33], B.4(f) [page
12 35], and D.2 [page 41]), he scrambled to seek out and pursue whatever means
13 of legal redress was possibly available.

14     In July of 1997, despite his ignorance of legal practice and procedure,
15 Petitioner conducted what very little research he could in the mere two
16 hours a week maximum that he was allowed inside the prison law library. As a
17 result, he found what he believed were valid grounds on which relief could
18 be obtained on habeas corpus, so he promptly prepared and mailed at least
19 150 letters to various California attorneys and law schools throughout the
20 month of August 1997. Following the next few months of Petitioner receiving
21 many responses and sending many replies, Petitioner's family ended up
22 retaining an attorney in Sacramento by the name of Richard Dangler.

23     Over the next several months in 1998, attorney Dangler not only told
24 Petitioner and Petitioner's family that Petitioner definitely had solid
25 grounds for relief on habeas corpus, but also that there was plenty of time
26 for Dangler to get a habeas petition filed in Superior Court on Petitioner's
27 behalf. (However, Dangler then took nearly three years to get Petitioner's
28 first petition filed [see, infra at G], another 18 months to get
29 Petitioner's second petition filed [infra at I], and thereafter got
30 disbarred with disciplinary charges pending in large part because of
31 Petitioner's complaint against him to the State Bar of California [see,
32 State Bar Case Number 03-O-04136], which subsequently mentioned by a
33 California Court of Appeal in a ruling wherein Dangler was sanctioned and
34 otherwise censured for the improper way he had handled so many prisoners'
35 cases on habeas corpus [see, In re White 18 Cal.Rptr.3d 444 (Cal. App. Dist.
36 3, 2004].)

37 //
38 //

**E. Apprendi v. New Jersey, 530 U.S. 466 (2000).**

On June 26, 2000, the U.S. Supreme Court -- citing the 1970 case of In re Winship 397 U.S. 358 -- held that any fact(s) exposing a defendant to a greater potential sentence must be submitted to and found by a jury beyond a reasonable doubt rather than by a judge on a mere preponderance of the evidence as occurred in Petitioner's case.

**F. Newly discovered evidence of IAC at sentencing.**

On October 10, 2001, the attorney who had "represented" Petitioner at sentencing, James Locke (see, supra at B.4(e) and B.4(f) [pages 34, 35]), provided Petitioner with a sworn declaration wherein he admits that he had given ineffective assistance of counsel to Petitioner at sentencing -- in ignorance of California sentencing laws -- after soliciting money from Petitioner's mother by dishonestly representing himself as an experienced criminal attorney. (See, post at Grounds for Relief 2 and 6 [and exhibit(s) referenced therein].)

**G. 1st habeas petition, 01F08858, California Superior Court, Sacramento County.**

On November 5, 2001, attorney Richard Danger (see supra at D.3) **finally** got a petition for writ of habeas corpus filed on Petitioner's behalf at the trial court.

Setting forth all of the facts and information thus far set forth herein (supra at A-F), the petition presented several grounds for relief, including (1) the newly discovered evidence of illegally withheld exculpatory material in the Barbara rape case (see, supra at D.2); (2) the newly discovered evidence of ineffective assistance of counsel Petitioner had received at sentencing (supra at F); and (3) that Petitioner had been given such an excessive and grossly enhanced consecutive sentence in violation of Amendments VI and XIV to the U.S. Constitution as both previously and recently affirmed by the U.S. Supreme Court in the 1970 case of In re Winship and the 2000 case of Apprendi v. New Jersey. (See, supra at E.)

Despite any merit the petition had, however, Judge CHERYL CHUN MEEGAN -- a judge who had no known involvement with Petitioner's criminal case at trial -- issued a harshly worded order denying the appeal as untimely and otherwise procedurally barred.

**H. Newly discovered evidence of innocence in Charlene case (Counts 13-15).**

For many years following all that he had gone through after arriving in the prison system on 3/17/94 (see, supra at D.1), Petitioner stayed heavily involved with and deeply committed to identifying, addressing, and otherwise trying to resolve everything he possibly could about himself that had

1   contributed to what he had done to get himself in prison. (Id.)

2       However, Petitioner was completely unable to explore or conduct meaningful
3   work on certain negative issues long existent between him and his mother
4   because a Sacramento County warrant had thus far been preventing her from
5   visiting Petitioner since **before** he came to prison on 3/17/94.

6       As a result of thus being separated from his mother for so many years,
7   Petitioner contacted the Office of the Sacramento County District Attorney to
8   offer an open dialogue about himself in exchange for help getting his mother
9   cleared to finally visit him.

10      Subsequently, in June of 1999, the prosecutor in Petitioner's case, Mike
11  Savage, sent the D.A.'s chief investigator, Tricia Hacker, to talk with
12  Petitioner in response to Petitioner's letter. Hacker recorded the conversation
13  on audiotape, but **promised** Petitioner that **only** Mike Savage would **ever** hear the
14  conversation and that the conversation would **not** be later used **against**
15  Petitioner on habeas corpus.

16      Over the course of their 5-hour meeting, Petitioner admitted to an
17  "adversarial" party for the first time ever that he in fact was with Charlene
18  on 8/4/91. (But Petitioner did **not** suggest that he had **ever** sexually battered
19  or digitally penetrated Charlene -- as he had **not** committed **any** such acts
20  against Charlene -- only **that** he had lied at trial, in denying that he was the
21  man whose car Charlene had gotten into on 8/4/91, and **why** [i.e., the **reprimand**
22  he received at the jail in 1992 from the deputy public defender assigned to
23  represent him at the time (see, supra at B.1)].)

24      Additionally, Petitioner shared with Tricia Hacker all the self-help work he
25  had been doing since coming to prison five years earlier, and discussed with
26  Hacker his adherence to the 12-Step recovery process developed by the founders
27  of Alcoholics Anonymous.

28      When Petitioner explained that Steps 8 and 9 of the 12-Step model require
29  that he become completely willing to accept **full** responsibility for **all** past
30  harm(s) he even **might** have caused others in **any** manner whatsoever throughout
31  his life, and that he seek to make amends with all such people in his past
32  wherever possible without causing further harm(s), Tricia Hacker offered to
33  facilitate any such communications Petitioner might someday want to attempt
34  with Sara, Charlene, and/or anyone else.

35      A short time later, the Office of the District Attorney notified Petitioner
36  through Tricia Hacker that his mother's warrant had been cleared and that she
37  would finally be permitted to visit him in prison.

38      Subsequently, in December of 1999, Petitioner did prepare and send letters

of "amends" to Tricia Hacker at the Office of the District Attorney for forwarding to Sara and Charlene pursuant to the 8th and 9th Steps of the 12-Step recovery process.

Petitioner's December 1999 amends letter to Sara was venemously responded to by the boyfriend of Sara's mother after it had been given to and read only by him.

But Petitioner's December 1999 amends letter to Charlene ended up sitting inside the Office of the District Attorney for more than a year because Charlene could not be located.

Then, out of the blue in December 2000, Charlene contacted the Office of the District Attorney on her own to ask what all had happened with Petitioner since she had testified against him at trial. (See, supra at B.3(e) [pages 24, 25].)

When Charlene thereupon learned that Petitioner had written her the December 1999 amends letter that had since been sitting inside the Office of the District Attorney, she immediately accepted the letter and courteously sent Petitioner a prompt response back through the Office of the District Attorney.

Likewise, as soon as Petitioner received Charlene's December 2000 response letter that same month, he respectfully acknowledged it with a prompt reply that he mailed to Charlene once again through the Office of the District Attorney.

However, Petitioner's December 2000 reply letter to Charlene, just like his December 1999 amends letter before it, **also** ended up sitting inside the Office of the District Attorney for **no less than** another year because Charlene again could not be located.

But when Charlene finally did contact the Office of the District Attorney again on her own in late 2001 or early 2002, she became confused upon reading in Petitioner's waiting reply letter of December 2000 that Petitioner's **only** trial and conviction **ever** had been **just** on the charges concerning her and Sara rather than anyone else.

Accordingly, Charlene took it upon herself to investigate whether Petitioner was lying to her about being in prison **only** on the charges involving her and Sara, so she wrote another letter to Petitioner and **insisted** on questioning Petitioner's mother, sister, fiancee, and habeas attorney to see if Petitioner had told her the truth about the extent of his criminal charges and conviction. She also **demanded** and promptly received a complete copy of Petitioner's recent habeas petition. (See, supra at G.)

Through conducting her own private investigation, Charlene came to realize how the Sacramento County Sheriff's Department and Office of the District

Attorney had manipulated her into **falsely** thinking and believing, both prior to and at the time she testified against Petitioner at trial, that Petitioner is a "**serial** rapist" who she needed to testify against for the good of society.

Consequently, sometime around Easter 2002, Charlene contacted Petitioner's habeas attorney (supra at D.3) and **finally** confessed that she had lied against Petitioner from the very beginning (i.e., since 8/4/91) for reasons that included various personal and psychological problems she had been dealing with in her life at the time as well as miscellaneous inducements she was offered by the Sacramento County Sheriff's Department and Office of the District Attorney following Petitioner's arrest on 11/22/92.

Immediately after Charlene's above communication, Petitioner's attorney drafted a declaration based on everything Charlene had told him and mailed it to Charlene so she could either sign and date it, reject it outright, or indicate any changes she might want made for it to meet with her approval. After several revisions were then mailed back and forth between Charlene and Petitioner's attorney over the next few months, Charlene finally signed a declaration on 11/22/02. (See, post at Ground for Relief 1 [and exhibit(s) referenced therein].)

Because of the above events and surrounding circumstances, Petitioner and Charlene naturally communicated through additional letters and even spoke a few times by phone, but such additional communication did not begin to occur until **after** Charlene had **already** confessed to Petitioner's attorney around Easter of 2002 that she had lied against Petitioner since 8/4/91, and **after** she had signed her subsequent declaration in November 2002.

Thus the **only** communication that **ever** took place between Petitioner and Charlene **before** those two particular events was merely **incidental to** (1) Petitioner's December 1999 amends letter to Charlene through the Office of the District Attorney; (2) Charlene's December 2000 response letter after not receiving Petitioner's December 1999 amends letter until a year later; (3) Petitioner's December 2000 reply letter that Charlene **also** did not receive until at least a year later in late 2001 or early 2002; and (4) Charlene's subsequent questioning of Petitioner and Petitioner's mother, sister, fiancee, and attorney in early 2002 as to why exactly Petitioner was in prison beyond those charges involving her.

**I. 2nd habeas petition, C044019, California Court of Appeal, Third District.**

On May 16, 2003, Petitioner's attorney on habeas corpus (see, supra at D.3) finally got a second habeas corpus petition filed on Petitioner's behalf, this time in the Court of Appeal. (See, supra at G.)

1    In addition to setting forth all the facts and information thus far set
2  forth herein (supra at A-H), the petition presented all of the same grounds for
3  relief presented to the court below and also introduced the newly discovered
4  evidence of Petitioner's **actual innocence** in the Barbara case. (Supra at H.)

5    Accordingly, on July 31, 2003, the Honorable Presiding Justice SCOTLAND of
6  the Court of Appeal denied the petition "without prejudice to filing in the
7  trial court a claim of innocence" regarding the counts in the Charlene case.

8  **J. 3rd habeas petition, 03F09161, California Superior Court, Sacramento County.**

9    On September 30, 2003, pursuant to and in accordance with the appellate
10  court's above order of 7/31/03, Petitioner returned to the Superior Court with
11  a claim of innocence in the Charlene case, but had to do so **in propria persona**
12  after and because his retained counsel on habeas corpus, Richard Dangler (see,
13  supra at D.3), essentially **abandoned** Petitioner following the appellate court's
14  7/31/03 order.

15    On November 25, 2003, Judge C.C. MEEGAN (see, supra at G) **again** denied
16  Petitioner relief, this time denigrating Petitioner's **pro se** filing as a
17  successive, abusive, and otherwise procedurally barred writ that did not
18  establish Petitioner's "unerring innocence" in the Charlene case even though
19  Petitioner had presented to the Superior Court therein Charlene's sworn
20  declaration attesting to Petitioner's **actual innocence** in the specific acts
21  that he stood **falsely** accused and convicted of committing against Charlene on
22  8/4/91. (See, supra at B.1 and H.)

23  **K. Newly discovered evidence showing IAC, perjury by main prosecution witness.**

24    On October 5, 2003, Petitioner submitted a complaint to the State Bar of
25  California regarding his retained counsel on habeas corpus, Richard Dangler,
26  **abandoning** him at such a critical time following the appellate court's earlier
27  order of 7/31/03. (Supra at I.)

28    When the State Bar notified attorney Dangler of Petitioner's complaint,
29  Dangler immediately sought Petitioner's forgiveness and promised to diligently
30  represent Petitioner all the way up to and through the U.S. Supreme Court if
31  necessary at no further cost to Petitioner or Petitioner's family if Petitioner
32  would agree to withdraw the 10/5/03 complaint.

33    Acting in good faith that attorney Dangler was sincere, Petitioner did
34  withdraw the complaint as Dangler had requested and thereafter believed that
35  Dangler was preparing a petition on his behalf to the Court of Appeal that
36  challenged Judge MEEGAN's recent denial of Petitioner's **pro se** innocence claim
37  in the Charlene case on 11/25/03. (See, supra at J.)

38    Subsequently, on June 25, 2004, Petitioner's mother faxed to attorney

Dangler and mailed to Petitioner several pages of legal documents that she had just discovered on her own in records of the Sacramento County Superior Court regarding the former girlfriend of Petitioner's, Lynn Rominger -- the woman whom the prosecutor had been allowed to call to give **false** and otherwise prejudicial "stalking" testimony against Petitioner at trial and sentencing that the trial judge then used as "propensity" evidence to help justify the sentence he gave to Petitioner on 2/18/94. (See, supra at 3(f) [page 26, 5th ¶], 4(e) [page 35], and 4(f) [pages 37, 38]; see also, post at Grounds for Relief 2 through 6 [and exhibit(s) referenced therein].)

Filed October 18, 1993, **four months** before Lynn Rominger had been allowed at Petitioner's sentencing hearing to **again** give **false** and **unchallenged** testimony against Petitioner, the documents that Petitioner's mother discovered reveal that for **at least** one year before 10/18/93 -- i.e., **two months** before Petitioner was arrested on 11/22/92 and thus **a year** before Petitioner's trial in August 1993 -- Lynn Rominger and her family had "made a habit of being physically and emotionally **abusive**" to an adult boyfriend of Lynn's named Tyler Keagy.

The many examples of abuse in Keagy's complaint and request for a **restraining order** include (1) Lynn **striking** Keagy with closed **fists**; (2) Lynn repeatedly **pushing and shoving** Keagy and then suddenly starting to cry as though Keagy had done something wrong; (3) Lynn and her parents **threatening** Keagy with "We'll get your ass," "Our family has power," and "We'll throw your ass in jail"; (4) Lynn's mother **striking** Keagy in church; (5) Lynn **emotionally blackmailing** Keagy with threats involving their infant child (e.g., "Unless you call me back in one hour you'll never see this baby!"); and (6) Lynn STALKING Keagy while Keagy was at college and out with friends.

**L. Blakely v. Washington, 542 U.S. 296 (2004).**

While Petitioner was waiting for his habeas attorney Richard Dangler to get the next petition ready for the Court of Appeal (see, supra at K), the U.S. Supreme Court further expounded upon the **fundamental** sentencing rule previously addressed in the 1970 case of In re Winship and the 2000 case of Apprendi v. New Jersey. (See, supra at E.)

Specifically, the U.S. Supreme Court stated that the relevant "statutory maximum" a judge can give a defendant under the guiding clarifications set forth in Apprendi is the maximum sentence a judge is allowed to impose "**without** any additional findings" of fact. (See, Blakely at 303-04 [emphasis in original].)

//

**M. 4th habeas petition, C049875, California Court of Appeal, Third District.**

On May 22, 2005, Petitioner mailed to the Court of Appeal a petition for writ of habeas corpus that he **again** had to prepare and file **in propria persona** because of attorney Richard Dangler's **further** misconduct against him and subsequent disbarment. (See, supra at D.3, J, and K.)

In his pro se petition, Petitioner set forth all of the facts and information thus far asserted herein (supra at A-L), and each of the grounds for relief that he had presented in his three earlier petitions. (See, supra at G, I, and J.) Petitioner also introduced the newly discovered evidence regarding Lynn Rominger (see, supra at K) and added the U.S. Supreme Court's recent Blakely ruling (supra at L) to further support the claim he has been making since his very first petition (supra at G) that he was excessively and/or otherwise erroneously sentenced in violation of the U.S. Constitution's Sixth and Fourteenth Amendments. (See, post at Ground for Relief 6.)

Moreover, Petitioner extensively argued that Judge MEEGAN had erred when she denied Petitioner's third petition on 11/25/03 despite the Court of Appeal's 7/31/03 order. (See, supra at I and J.)

After the Court of Appeal then filed the petition on 6/1/05, Petitioner experienced the following in relation thereto:

1. Order to Show Cause

On December 1, 2005, the Court of Appeal's Honorable Presiding Justice SCOTLAND, who had reviewed Petitioner's 2003 claim of actual innocence in the Charlene case (see, supra at I), issued an Order to Show Cause returnable before the Superior Court **again** on the newly discovered evidence of Petitioner's **actual innocence** in the Charlene case. (See, supra at H [pages 43, 44].)

However, when Petitioner's case then got transferred down to the Superior Court from the Court of Appeal, it **too** was put on the calendar of Judge C.C. MEEGAN, who was not only the same judge who had **twice** before denied Petitioner any type of relief on habeas corpus (see, supra at G and J) but also the very judge whose recent denial of Petitioner's third habeas petition (supra at J) had essentially just been **overturned** by the Court of Appeal in Petitioner's favor and was thus **again** before the Superior Court for **appropriate** review and disposition following yet **another** of Judge MEEGAN's **erroneous** rulings against Petitioner. (Supra.)

2. Evidentiary Hearing

On May 2, 2006, irrespective of whatever bias or other disqualifying factor(s) might thus have reasonably **precluded** Judge MEEGAN from having any

49

further involvement in Petitioner's case, an evidentiary hearing was conducted by Judge MEEGAN concerning the newly discovered evidence of Petitioner **actual innocence** in the Charlene case. (Supra at H.)

At the hearing, Charlene very credibly **confirmed** under oath the truth of **everything** that she had told Petitioner's attorney around Easter of 2002 (supra at page 46) and in her subsequent sworn declaration (id.) about Petitioner's **actual innocence** in the specific charges of sexually battering and digitally penetrating her on 8/4/91. (See, supra at B.1(a) [page 12] and B.3(e) [page 24].) Afterward, Judge MEEGAN ordered Petitioner's retained attorney Marilee Marshall and Deputy District Attorney Albert Locher to submit their summations by brief upon receiving a certified copy of the Reporter's Transcript of the evidentiary hearing.

## 3. Denial of Relief in Superior Court

On July 28, 2006, Judge MEEGAN **again** denied Petitioner **any** type of relief on habeas corpus despite the newly discovered evidence of Petitioner's **actual innocence** in the Charlene case.

Judge MEEGAN's denial was based on **nothing** against Charlene's demeanor or manner of testifying at the evidentiary hearing, but rather on **unsupported extrapolations** from the record, **including** from a transcript of Petitioner's 5-hour discussion in June 1999 with Tricia Hacker that Petitioner was **promised** would **not** be made known to anyone but the prosecutor from Petitioner's trial and would **not** be used against Petitioner in his case on habeas corpus. (See, supra at H [page 44].)

## 4. Return to Court of Appeal

Accordingly, on October 23, 2006, Petitioner's retained attorney Marilee Marshall petitioned the Court of Appeal to review Petitioner's claim of actual innocence in the Charlene case in light of Judge MEEGAN's above denial.

However, on November 16, 2006, the petition was **summarily** denied by the Honorable CANTIL-SAKAUYE, Presiding Justice (Acting), who before then had **no** known involvement or even familiarity with Petitioner's case as did the Court of Appeal's Honorable Presiding Justice SCOTLAND. (See, supra at I and M.1.)

## 5. Petition for Review

As a result of the summary denial above, Petitioner's retained counsel Marilee Marshall submitted a timely Petition for Review asking the California Supreme Court to please answer whether the courts below had erred by not granting Petitioner any type of relief on habeas corpus despite the

1    newly discovered evidence of his **actual innocence** in the Charlene case.

2    6. Cunningham v. California, 549 U.S. --- (2007)

3        Meanwhile, on January 22, 2007, while the above Petition for Review was
4    pending before the California Supreme Court, the U.S Supreme Court -
5    referring to its earlier rulings in Apprendi v. New Jersey and Blakely v.
6    Washington (see above, at E and L) - held that California's Determinate
7    Sentencing Law is and has been unconstitutional to the extent that allowing
8    a judge rather than a jury to determine on a mere preponderance of evidence
9    rather than beyond a reasonable doubt any aggravating factor(s) exposing a
10   defendant to a longer sentence, such as occurred in Petitioner's case,
11   violates Amendments VI and XIV to the United States Constitution.

12   7. Denial of Petition for Review

13       Just a few days later, on February 16, 2007, Petitioner received an order
14   wherein the California Supreme Court had denied his 11/21/06 Petition for
15   Review. (See above, at M.5.)

16   **N. Final state habeas petition, S156134, California Supreme Court.**

17       As stated previously herein at § II.J (pp. 6, 7), the California Department
18   of Corrections and Rehabilitation both was and still is experiencing an ongoing
19   State of Emergency - as declared by Governor Schwarzenegger and recognized by
20   U.S. District Judges HENDERSON, KARLTON, and REINHARDT - before, after, and
21   since the time that Petitioner received the California Supreme Court's denial
22   of his above Petition for Review on 2/16/07.

23       In addition, Petitioner was and still is actively prosecuting several civil
24   actions in state and federal courts without assistance from counsel while
25   simultaneously suffering not only a professionally verified writing impairment
26   that prison officials have thus far refused to most reasonably and necessarily
27   accommodate but also an ongoing denial by prison personnel of meaningful and
28   unimpeded access to the prison law library and thus the courts in blatant
29   violation of the Constitution and laws of the United States and of the State of
30   California, including various administrative regulations promulgated by the
31   CDCr.

32       Faced with such conditions and concerned about the timeliness of his final
33   petition's submission to the California Supreme Court, Petitioner did
34   everything he could think of to promptly present the six particular Grounds for
35   Relief contained herein raised before the California Supreme Court.

36       Such measures by Petitioner included the filing of no less than five
37   administrative grievances concerning denial of his statutorily authorized
38   access to the law library, the courts, and the reasonable, necessary, and

1    available accommodation he requires for his verified medical condition that
2    substantially impairs his ability to write. Petitioner has since had to
3    initiate civil litigation in the U.S. District Court for the Northern District
4    of California concerning the aforementioned law and rights violations. (See,
5    K'nAPP v. Tilton, et al. (N.D. Cal. 1/22/08) No. CV 08 0719 JSW, Claims 17-19
6    [pp. 41-48].)

7        As a result of all the above, Petitioner was not able to mail his final
8    habeas petition to the California Supreme Court until 9/6/07, but even then he
9    had to do so without having been able to research, brief, or otherwise fully
10   and most effectively present any but the very first of his six Grounds for
11   Relief, which he sought to remedy by simultaneously motioning the California
12   Supreme Court within his petition for leave to file a Supplemental Points and
13   Authorities regarding Grounds for Relief 2 through 6, and/or for assistance
14   from counsel to be appointed by the Court.

15       The California Supreme Court, however, summarily denied Petitioner's
16   application for relief in a one-line denial that Petitioner received on 3/4/08.
17   (See, ante herein at 7:19-25.)

18       Hence, the California Supreme Court's denial of Petitioner's final
19   application for habeas corpus relief thus exhausted all of Petitioner's
20   available remedies within the State of California's judicial system.

21   ///
22   ///
23   ///
24   ///
25   ///
26   ///
27   ///
28   ///
29   ///
30   ///
31   ///
32   ///
33   ///
34   ///
35   ///
36   ///
37   ///
38   ///

## IV.

### GROUNDS FOR RELIEF

**Ground 1: Newly Discovered Evidence of Actual Innocence, False Testimony**

> NEWLY DISCOVERED EVIDENCE NOW POINTS UNERRINGLY TO PETITIONER'S **ACTUAL INNOCENCE**, UNDERMINES THE PROSECUTION'S CASE, CASTS DOUBT ON THE ACCURACY AND RELIABILITY OF ALL PROCEEDINGS BELOW THAT RESULTED IN PETITIONER'S CONVICTION AND SENTENCE, IS LIKELY TO PRODUCE A DIFFERENT RESULT ON RETRIAL, AND DEMONSTRATES THAT PETITIONER WAS UNFAIRLY TRIED, CONVICTED, SENTENCED, AND OTHERWISE PREJUDICED BY FALSE TESTIMONY THAT IS SUBSTANTIALLY MATERIAL AND PROBATIVE AS TO GUILT AND PUNISHMENT, ALL OF WHICH OCCURRED IN VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS AND A FAIR TRIAL AS GUARANTEED BY THE U.S. CONSTITUTION'S FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS.

### A. Cases

1. House v. Bell (2006) 126 S.Ct. 2064

2. Miller v. Pate (1967) 386 U.S 1

3. Schlup v. Delo (1995) 513 U.S. 298

4. Chapman v. California (1967) 386 U.S. 18

### B. Facts

Petitioner hereby restates and incorporates by reference inclusively the following facts and information previously set forth herein at § III:

• B.1(a), B.2(g), B.3(e), B.3(k), B.4(f), D.1, G, H, I, J, M.1 to M.7, and N (pp. 11, 12, 16, 24, 30, 35, 40, 43, 46, 49, and 51).

### C. Contentions

1. Back in the trial court on habeas corpus, Judge MEEGAN was or should have been disqualified from presiding over Petitioner's evidentiary hearing on 5/2/06 based on bias or other seeming impropriety caused by the California Court of Appeal twice overruling Judge MEEGAN's earlier rulings in Petitioner's case on habeas corpus.

2. Judge MEEGAN, in being allowed to preside over Petitioner's evidentiary hearing on 5/2/06, erroneously presumed that her role in the matter was to declare Charlene's recantation either true or false rather than merely whether it could be deemed credible or not by a jury on retrial.

3. Judge MEEGAN, in being allowed to preside over Petitioner's evidentiary hearing on 5/2/06, erroneously permitted and relied upon the transcript of the June 1999 discussion that had taken place between Petitioner and the Office of the Sacramento County District Attorney to deny Petitioner relief on habeas corpus in spite of the underlying pretense for Petitioner's discussion with the D.A.'s office, the promise of confidentiality and

immunity Petitioner had been promised by the D.A.'s office in regard thereto, and the complete absence of any statement(s) within the transcript that contradicts Charlene's recantation.

4. Judge MEEGAN erroneously denied Petitioner's fourth habeas petition solely on the basis of unsupported extrapolations both from and beyond the record rather than because of anything having to do with Charlene's very credible demeanor and manner of testifying at the evidentiary hearing on 5/2/06.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

54

## Ground 2: Ineffective Assistance of Counsel

PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL BEFORE TRIAL, DURING TRIAL, AFTER TRIAL, AT SENTENCING, AND ON APPEAL, ALL IN VIOLATION OF HIS RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL AT EVERY MATERIAL PHASE OF TRIAL AS GUARANTEED BY THE U.S. CONSTITUTION'S FIFTH AND SIXTH AMENDMENTS.

**A. Cases**

1. Gideon v. Wainwright (1963) 372 U.S. 335
2. Douglas v. California (1963) 372 U.S. 353
3. Brady v. Maryland (1963) 373 U.S. 83
4. Pointer v. Texas (1965) 380 U.S. 400
5. Illinois v. Allen (1970) 397 U.S. 337
6. U.S. v. Cronic (1984) 466 U.S. 648
7. Strickland v. Washington (1984) 466 U.S. 668
8. Smith v. Robbins (2000) 528 U.S. 259
9. Wiggins v. Smith (2003) 539 U.S. 510
10. Crawford v. Washington (2004) 541 U.S. 36
11. Williams v. Taylor (2006) 529 U.S. 362

**B. Facts**

Petitioner hereby restates and incorporates by reference inclusively the following facts and information previously set forth herein at § III:

1. IAC before trial: see, B.1(a), B.2(a), B.2(b), B.2(c), B.2(e), B.2(f), D.2, H, and K (pp. 11-16, 41, 43, and 47).
2. IAC during trial: see, B.3(a), B.3(d), B.3(e), B.3(f), B.3(g), B.3(j), B.3(k), D.2, H, and K (pp. 17, 19, 21, 24, 25, 27, 28, 31, 41, 43, and 47).
3. IAC after trial: see, B.4(b), B.4(d), and D.2 (pp. 33 and 41).
4. IAC at sentencing: see, B.4(e), B.4(f), D.2, F, H, and K (pp. 34, 35, 41, 43, and 47).
5. IAC on appeal: see, C, D.2, and K (pp. 39, 41, and 47).

**C. Contentions**

1. Petitioner's pretrial counsel essentially instructed Petitioner to lie about being involved with the Charlene case.
2. Petitioner's counsel before trial, during trial, after trial, at sentencing, and on appeal failed to disclose to Petitioner, any court, or the media the exculpatory evidence of Petitioner's actual innocence in the Barbara rape case that was consequently allowed to remain pending against Petitioner, be relied upon to falsely label Petitioner "serial rapist" in the media before and during trial, and become known to Petitioner's jury at trial as a pending additional sex case that was currently charged against Petitioner.

3. Petitioner's pretrial counsel failed to reasonably investigate prosecutorial witness Charlene and thereby discover Petitioner's actual innocence in Counts 13 to 15.

4. Petitioner's pretrial counsel failed to reasonably investigate prosecutorial witness Lynn Rominger and thereby discover the existing evidence impeaching her false testimony at Petitioner's trial that Petitioner's mother has since obtained as newly discovered evidence.

5. Petitioner's trial counsel failed to reasonably cross-examine prosecutorial witness Sara and thereby expose, discredit, or otherwise cast doubt upon the many false and inconsistent statements Sara had made to detectives initially and in testifying against Petitioner at trial.

6. Petitioner's trial counsel failed to reasonably cross-examine prosecutorial witness Charlene and thereby expose, discredit, or otherwise cast doubt upon the false testimony Charlene gave against Petitioner at trial.

7. Petitioner's trial counsel failed to reasonably cross-examine prosecutorial witness Lynn Rominger and thereby expose, discredit, or otherwise cast doubt upon the false testimony that Lynn Rominger was allowed to give against Petitioner at trial.

8. Petitioner's trial counsel gave such a highly prejudicial closing statement that he essentially took on the role of prosecutor against Petitioner.

9. Petitioner's trial counsel so utterly failed to defend Petitioner that the trial was the functional equivalent of a guilty plea, thus rendering trial counsel's representation presumptively inadequate.

10. Petitioner's trial counsel refused to investigate and thereby prove Petitioner's disclosure of mitigating circumstances relating to the Sara case after trial.

11. Petitioner's sentencing counsel failed to reasonably investigate prosecutorial witness Lynn Rominger and thereby discover the existing evidence impeaching her false testimony at Petitioner's sentencing that Petitioner's mother has since obtained as newly discovered evidence.

12. Petitioner's sentencing counsel failed to reasonably cross-examine prosecutorial witness Lynn Rominger and thereby expose, discredit, or otherwise cast doubt upon the false testimony that Lynn Rominger was allowed to give against Petitioner at sentencing.

13. Newly discovered evidence now shows that Petitioner's sentencing counsel was incompetent and rendered ineffective assistance.

14. Petitioner's appellate counsel failed to discover the existing evidence which Petitioner's mother has since obtained as newly discovered evidence

_56_

1  impeaching the false testimony that prosecutorial witness Lynn Rominger was
2  allowed to give against Petitioner at trial and sentencing.
3  15. Petitioner's appellate counsel failed to raise the significant issues
4  presented herein concerning the unconstitutional manner in which Petitioner
5  was prosecuted, represented, tried, convicted, and sentenced despite being
6  made fully aware thereof both by Petitioner and by the record on appeal.

7  ///
8  //
9  /
10 ///
11 //
12 /
13 ///
14 //
15 /
16 ///
17 //
18 /
19 ///
20 //
21 /
22 ///
23 //
24 /
25 ///
26 //
27 /
28 ///
29 //
30 /
31 ///
32 //
33 /
34 ///
35 //
36 /
37 ///
38 //

## Ground 3: Prosecutorial Misconduct

PETITIONER WAS CONVICTED AND SENTENCED IN SIGNIFICANT PART BECAUSE OF PROSECUTORIAL MISCONDUCT THAT DEPRIVED PETITIONER OF HIS RIGHT TO A FAIR TRIAL AND TO DUE PROCESS AS GUARANTEED BY THE U.S. CONSTITUTION'S FIFTH AND FOURTEENTH AMENDMENTS.

**A. Cases**

1. Berger v. U.S. (1935) 295 U.S. 78
2. Napue v. Illinois (1959) 360 U.S. 264
3. Brady v. Maryland (1963) 373 U.S. 83
4. Pointer v. Texas (1965) 380 U.S. 400
5. Miller v. Pate (1967) 386 U.S. 1
6. Chapman v. California (1967) 386 U.S. 18
7. U.S. v. Russell (1973) 411 U.S. 423
8. U.S. v. Young (1985) 470 U.S. 1
9. Darden v. Wainwright (1986) 477 U.S. 168
10. Kyles v. Whitley (1995) 514 U.S. 419
11. Crawford v. Washington (2004) 541 U.S. 36
12. Davis v. Washington (2006) 126 S.Ct. 2266

**B. Facts**

Petitioner hereby restates and incorporates by reference inclusively the following facts and information previously set forth herein at § III:

· B.1, B.2(a), B.2(b), B.2(d), B.3(a), B.3(e), B.3(f), B.3(g), B.3(k), B.4(b), B.4(e), B.4(f), D.2, H, and K (pp. 11-14, 17, 24, 26, 27, 30, 33, 35, 37-39, 41, 43, and 47).

**C. Contentions**

1. The prosecution, despite possessing exculpatory evidence of Petitioner's actual innocence in the Barbara rape case, falsely charged Petitioner with that case and then kept Petitioner so charged therewith throughout the time that Petitioner was being prosecuted on the separate and unrelated cases involving Sara and Charlene.

2. The prosecution, after falsely charging Petitioner in the Barbara rape case despite possessing exculpatory evidence of Petitioner's actual innocence thereof, vindictively used that case to manipulate a **false** "serial rapist" image of Petitioner in the media which lasted throughout the time Petitioner was being prosecuted in the Sara rape case and the **nonrape** Charlene case.

3. The prosecution failed to disclose to the trial court prior to or at any preliminary hearing the exculpatory evidence that was in the prosecution's possession of Petitioner's actual innocence in the Barbara rape case which

would have caused that case to get dismissed early on and not later be allowed to prejudice Petitioner as it did both by and through the false "serial rapist" labeling of Petitioner in the media and when Petitioner's jury at trial became aware that Petitioner was also charged in that pending other rape case.

4. The prosecution offered Petitioner an 80-year sentence in exchange for Petitioner's plea of guilt in all three of the separate and unrelated cases involving Sara, Charlene, and Barbara despite possessing exculpatory evidence of Petitioner's actual innocence in the Barbara rape case.

5. The prosecution coached both Sara and Charlene on what to say and how to say it in testifying against Petitioner at trial.

6. The prosecution manipulated Charlene into giving false testimony against Petitioner at trial by falsely convincing Charlene that Petitioner was a "serial" rapist whom Charlene would be considered a hero for helping to convict through such false testimony.

7. The prosecution used Lynn Rominger to give false "stalking" and "propensity" testimony against Petitioner at trial without disclosing to the court or Petitioner's counsel any of the existing documentary evidence that Petitioner's mother has since obtained as newly discovered evidence showing Lynn Rominger to have been mentally unstable at the time and recently accused of **stalking** one of her boyfriends before, during, and after the time of Petitioner's trial.

8. The prosecution caused the jury to hear several excerpts from conversations between Petitioner and a girlfriend recorded while they were visiting in the jail that were presented out of context and omitted Petitioner's surrounding statements that are actually mitigating, exculpatory, and even corroborating of Petitioner's trial testimony regarding the Sara case.

9. The prosecution, while delivering the closing summation to the jury, repeatedly called Petitioner a "liar" and "monster", personally vouched for the credibility of Charlene's and Sara's trial testimony against Petitioner, denigrated and disparaged Petitioner and Petitioner's counsel, and otherwise engaged in outrageous conduct that was designed to exert undue influence over the jury and thus incite the jury to become excessively prejudiced against Petitioner.

10. The prosecution utilized the false "stalking" and "propensity" testimony of Lynn Rominger against Petitioner at sentencing without disclosing either to the court or to Petitioner's counsel the existing court documents that Petitioner's mother has since obtained as newly discovered evidence showing

59

1    Lynn Rominger to have been mentally unstable and accused of **stalking** one of
2    her former boyfriends before, during, and after the time of Petitioner's
3    trial.
4    ///
5    ///
6    ///
7    ///
8    ///
9    ///
10   ///
11   ///
12   ///
13   ///
14   ///
15   ///
16   ///
17   ///
18   ///
19   ///
20   ///
21   ///
22   ///
23   ///
24   ///
25   ///
26   ///
27   ///
28   ///
29   ///
30   ///
31   ///
32   ///
33   ///
34   ///
35   ///
36   ///
37   ///
38   ///

### Ground 4: Jury Prejudice

PETITIONER WAS DENIED HIS RIGHT TO BE TRIED BY A FAIR AND IMPARTIAL JURY AS GUARANTEED BY THE U.S. CONSTITUTION'S FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS.

**A. Cases**

1. Berger v. U.S. (1935) 295 U.S. 78
2. Remmer v. U.S. (1954) 347 U.S. 227
3. Napue v. Illinois (1959) 360 U.S. 264
4. Russell v. U.S. (1962) 369 U.S. 749
5. Brady v. Maryland (1963) 373 U.S. 83
6. Pointer v. Texas (1965) 380 U.S. 400
7. Sheppard v. Maxwell (1966) 384 U.S. 333
8. Miller v. Pate (1967) 386 U.S. 1
9. Doyle v. Ohio (1976) 426 U.S. 610
10. Jackson v. Virginia (1979) 443 U.S. 307
11. U.S. v. Bailey (1980) 444 U.S. 394
12. U.S. v. Cronic (1984) 466 U.S. 648
13. Strickland v. Washington (1984) 466 U.S. 668
14. U.S. v. Young (1985) 470 U.S. 1
15. Darden v. Wainwright (1986) 477 U.S. 168
16. Mathews v. U.S. (1988) 485 U.S. 58
17. Osborne v. Ohio (1990) 495 U.S. 103
18. Kyles v. Whitley (1995) 514 U.S. 419
19. U.S. v. Gaudin (1995) 515 U.S. 506
20. Wiggins v. Smith (2003) 539 U.S 510
21. Crawford v. Washington (2004) 541 U.S. 36
22. Arthur Andersen, LLP v. U.S. (2005) 544 U.S. 696
23. Deck v. Missouri (2005) 125 S.Ct. 2007
24. Davis v. Washington (2006) 126 S.Ct. 2266

**B. Facts**

Petitioner hereby restates and incorporates by reference inclusively the following facts and information previously set forth herein at § III:

• B.1(a), B.2(a), B.2(b), B.2(g), B.3(a), B.3(c), B.3(e), B.3(f), B.3(g), B.3(h), B.3(i), B.3(j), B.3(k), B.4(a), B.4(b), B.4(f), D.2, H, and K (pp. 11, 13, 16-18, 24, 27, 28, 30, 32, 33, 35, 41, 43, and 47).

**C. Contentions**

1. The jury was allowed to hear and read mere snippets of recorded conversations between Petitioner and his girlfriend that were not in context and omitted Petitioner's surrounding statements that were corroborating,

1     mitigating, and even exculpatory in relation to the testimony he gave at
2     trial.

3 2. The jury was exposed to no less than 20 local newspaper articles in which
4     Petitioner was falsely labeled "serial" rapist before, during, and after
5     Petitioner's trial.

6 3. The jury was made aware of the extrinsic Barbara rape case that was charged
7     and pending against Petitioner separately from the Sara and Charlene trial,
8     but were not told about the existing evidence possessed by the prosecution
9     at the time proving Petitioner's actual innocence in that case.

10 4. The jury was allowed to hear the Sara rape case in conjunction with the
11     inflammatory but now admittedly false testimony in the **nonrape** Charlene case
12     of Counts 13 to 15.

13 5. The jury that heard the two sex cases charged against Petitioner was
14     unfairly comprised of eight women and only four men.

15 6. The jury was improperly instructed prior to receiving evidence.

16 7. The jury was allowed to hear the highly inflammatory but now admittedly
17     false testimony against Petitioner by Charlene that had nothing at all to do
18     with the completely unrelated Sara case.

19 8. The jury was allowed to hear Lynn Rominger's false "stalking" and
20     "propensity" testimony against Petitioner without being told about the
21     existing evidence that Petitioner's mother has since obtained as newly
22     discovered evidence showing Lynn Rominger to have been mentally unstable and
23     accused of stalking at least one of her former boyfriends before and during
24     the time of Petitioner's trial.

25 9. Petitioner's trial counsel so utterly failed to effectively defend
26     Petitioner against the charges that the trial was the functional equivalent
27     of a guilty plea.

28 10. Petitioner was forced to put on a "ski mask" while on the witness stand in
29     front of the jury.

30 11. Jury members cried and otherwise became emotionally upset when Petitioner's
31     mother was dragged kicking and screaming from the courtroom by the back of
32     her dress after the judge ordered the bailiff to remove her from the
33     courtroom for no apparent reason.

34 12. The jury was allowed to become aware of the potential sentence Petitioner
35     was facing upon conviction.

36 13. The prosecution, in delivering his closing summation to the jury,
37     repeatedly called Petitioner a "liar" and "monster", personally vouched for
38     the credibility of the testimony that Sara and Charlene had given against

1    Petitioner, denigrated and disparaged Petitioner and Petitioner's defense
2    counsel, and otherwise engaged in outrageous conduct that was designed to
3    exert undue influence over the jury and thus incite the jury to become
4    excessively prejudiced against Petitioner.

5    14. Petitioner's trial counsel gave such a highly prejudicial closing statement
6    to the jury that he essentially took on the role of prosecutor against
7    Petitioner.

8    15. Although the charges in the Sara rape case required Petitioner to have had
9    a particular mental state necessary to form required criminal intent, the
10   jury was improperly instructed after receiving evidence that Petitioner's
11   intoxication at the time of the Sara case did not make what happened that
12   night any less criminal.

13   ///
14   //
15   /
16   ///
17   //
18   /
19   ///
20   //
21   /
22   ///
23   //
24   /
25   ///
26   //
27   /
28   ///
29   //
30   /
31   ///
32   //
33   /
34   ///
35   //
36   /
37   ///
38   //
     /

### Ground 5: Cumulative Errors of the Court

PETITIONER WAS CONVICTED AND SENTENCED IN SIGNIFICANT PART BECAUSE OF NUMEROUS COURT ERRORS THAT, TAKEN TOGETHER, DENIED PETITIONER THE RIGHT TO DUE PROCESS AND A FAIR TRIAL AS GUARANTEED BY THE U.S. CONSTITUTION'S FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS.

### A. Cases

1. Estelle v. McGuire (1991) 502 U.S. 62
2. Remmer v. U.S. (1954) 347 U.S. 227
3. Russell v. U.S. (1962) 369 U.S. 749
4. Miller v. Pate (1967) 386 U.S. 1
5. Chapman v. California (1967) 386 U.S 18
6. U.S. v. Russell (1973) 411 U.S. 423
7. Doyle v. Ohio (1976) 426 U.S. 610
8. U.S. v. Bailey (1980) 444 U.S. 394
9. U.S. v. Cronic (1984) 466 U.S. 648
10. Strickland v. Washington (1984) 466 U.S. 668
11. U.S. v. Young (1985) 470 U.S. 1
12. Darden v. Wainwright (1986) 477 U.S. 168
13. Mathews v. U.S. (1988) 485 U.S. 58
14. Osborne v. Ohio (1990) 495 U.S. 103
15. Arizona v. Fulminante (1991) 499 U.S. 279
16. U.S. v. Martinez (2000) 528 U.S. 304
17. Arthur Andersen, LLP v. U.S. (2005) 544 U.S. 696

### B. Facts

Petitioner hereby restates and incorporates by reference inclusively the following facts and information previously set forth herein at § III:

· B.2(b), B.2(d), B.2(f), B.2(g), B.3(b), B.3(c), B.3(f), B.3(g), B.3(h), B.3(i), B.3(j), B.4(a), B.4(e), B.4(f), D.2, H, and K (pp. 13, 14, 16–18, 26–28, 32, 35, 41, 43, and 47).

### C. Contentions

1. The court did not conduct the preliminary hearing at which the prosecution would have had to disclose the exculpatory evidence that was in the prosecution's possession from the beginning of Petitioner's actual innocence in the Barbara rape case, which thus would have caused that case to get dismissed early on and not later be allowed to prejudice Petitioner as it did by and through both the false "serial rapist" labeling of Petitioner in the media and Petitioner's jury becoming aware in the midst of trial that Petitioner was also charged in the pending other rape case involving

1   Barbara.

2   2. The court refused to offer Petitioner any less than 59 years in exchange for
3      Petitioner pleading guilty to all three of the separate and unrelated cases
4      involving Sara, Charlene, and Barbara despite the existence of evidence
5      showing Petitioner's actual innocence in the Barbara rape case.

6   3. The court refused to grant Petitioner's Marsden motion for new trial counsel
7      despite Petitioner's showing that attorney Dennis Higgins had not
8      communicated with Petitioner about the case and was otherwise inadequately
9      prepared for trial.

10  4. The court refused to sever the Sara rape case from the unrelated and **nonrape**
11     Charlene case which newly discovered evidence now shows Petitioner was
12     actual innocence of committing.

13  5. The court became prejudiced against Petitioner as a result of emotionally
14     driven behavior by Petitioner's mother during trial.

15  6. The court gave the jury improper instructions which lessened the
16     prosecution's burden of proof, lowered the standard of proof beyond
17     reasonable doubt, and negated the mitigating effect of Petitioner's
18     intoxication in the Sara case on Petitioner's ability to have formed the
19     necessary criminal intent required in Counts 1 through 12.

20  7. The court allowed Lynn Rominger to give false "stalking" and "propensity"
21     testimony against Petitioner at trial despite the existence of evidence
22     showing Lynn Rominger was mentally unstable and accused of stalking one of
23     her former boyfriends before, during, and after the time of Petitioner's
24     trial.

25  8. The court allowed the jury to hear and read mere snippets of recorded
26     conversations between Petitioner and his girlfriend that were not in context
27     and failed to include Petitioner's surrounding statements that were
28     corroborating, mitigating, and even exculpatory as to his testimony at
29     trial.

30  9. The court imposed unconstitutional duress on Petitioner by forcing him to
31     wear a "ski mask" while on the witness stand in front of the jury.

32  10. The court caused the jury to become excessively prejudiced against
33      Petitioner by abruptly directing the bailiff to physically remove
34      Petitioner's mother from the courtroom, which caused Petitioner's mother to
35      react in a frightened, defensive, and otherwise emotionally charged manner
36      that caused not only Petitioner and Petitioner's jury to cry but also
37      tainted Petitioner's jury with extrinsic information they were not allowed
38      to know concerning the separately charged and pending Barbara rape case and

65

1    the potential sentence Petitioner was facing upon conviction.

2  11. The court failed to declare a mistrial despite learning that Petitioner's

3    jury had indeed become tainted with extrinsic information they were not

4    allowed to know concerning the separately charged and pending Barbara rape

5    case and the potential sentence Petitioner was facing upon conviction.

6  12. The court allowed both the prosecution and the defense to give highly

7    prejudicial closing statements to the jury.

8  13. The court, in sentencing Petitioner, allowed and even relied upon Lynn

9    Rominger's false "stalking" and "propensity" testimony against Petitioner

10    despite the existing evidence in possession of the prosecution showing Lynn

11    Rominger to have been mentally unstable and accused of stalking one of her

12    former boyfriends before, during, and after the time of Petitioner's trial.

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

29  ///

30  ///

31  ///

32  ///

33  ///

34  ///

35  ///

36  ///

37  ///

38  ///

1

### Ground 6: Unconstitutional Punishment

2
3
4
5

PETITIONER WAS ARBITRARILY, CAPRICIOUSLY, AND/OR OTHERWISE VINDICTIVELY SENTENCED TO AN EXCESSIVE TERM OF 98 CONSECUTIVE YEARS IN PRISON AND TO PAY A $10,000 VICTIM RESTITUTION FINE IRRESPECTIVE OF HIS RIGHT TO DUE PROCESS AS GUARANTEED BY THE U.S. CONSTITUTION'S FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS.

6  **A. Cases**

7    1. Chapman v. California (1967) 386 U.S 18

8    2. Benton v. Maryland (1969) 395 U.S. 784

9    3. In re Winship (1970) 397 U.S. 358

10    4. Brown v. Ohio (1977) 432 U.S 161

11    5. Solem v. Helm (1983) 463 U.S. 277

12    6. Harmelin v. Michigan (1991) 501 U.S. 957

13    7. Rutledge v. U.S. (1996) 517 U.S. 277

14    8. U.S v. Sablan (9th Cir. 1996) 92 F.3d 865

15    9. Apprendi v. New Jersey (2000) 530 U.S. 466

16    10. Blakely v. Washington (2004) 542 U.S. 296

17    11. Cunningham v. California (2007) 126 S.Ct. 856

18  **B. Facts**

19    Petitioner hereby restates and incorporates by reference inclusively the

20  following facts and information previously set forth herein at § III:

21  • B.1(c), B.2(d), B.2(e), B.2(f), B.4(c), B.4(e), B.4(f), F, H, and K (pp.

22  13-16, 33-39, 43, and 47).

23  **C. Contentions**

24    1. The trial court arbitrarily designated Count 10 as the principal term and
25      imposed the upper of three possible terms for reasons that had been neither
26      charged against Petitioner, submitted to the jury, nor proved to be true
27      beyond a reasonable doubt.

28    2. Rather than sentence Petitioner concurrently under California Penal Code §
29      1170.1, the trial court arbitrarily, capriciously, and vindictively chose to
30      sentence Petitioner consecutively under the **recidivist** sentencing scheme of
31      Penal Code § 667.6(c) for reasons that had been neither charged against
32      Petitioner, submitted to his jury, nor proved to be true beyond a reasonable
33      doubt.

34    3. For Counts 1 through 12 in the Sara case, the trial court imposed multiple
35      sentences on Petitioner totalling 85 consecutive years for the single
36      transaction of indivisible conduct during which Petitioner was very
37      intoxicated and did not have appreciably sufficient time to pause, reflect,
38      and thus form the specific criminal intent necessary to commit each alleged

act on a separate and distinct occasion.

4. For Counts 13 through 15 in the Charlene case, which newly discovered evidence now shows Petitioner **did not** commit, the trial court imposed multiple sentences on Petitioner totalling 13 years for the falsely alleged single transaction of indivisible conduct during which Petitioner would not have had appreciably sufficient time to pause, reflect, and thus form the specific criminal intent necessary to commit each falsely alleged act on a separate and distinct occasion.

5. The court arbitrarily, capriciously, and vindictively imposed a victim restitution fine against Petitioner in the amount of $10,000 without either Sara or Charlene suffering any actual financial loss and without conducting a hearing to determine the extent of Petitioner's poverty and inability to pay such a fine.

6. The trial court imposed an excessively harsh and severe sentence on Petitioner that is highly disproportionate to sentences meted out to other similarly situated defendants in other jurisdictions.

7. In light of the mitigating mental state Petitioner was in the night of the Sara case, the newly discovered evidence showing Petitioner's actual innocence in the Charlene case, the newly discovered evidence showing Petitioner's actual innocence in the Barbara rape case that was caused and/or allowed to prejudice Petitioner at trial due to being unlawfully suppressed by both the prosecution and the defense, the newly discovered evidence showing ineffective assistance of counsel Petitioner received at sentencing, and the newly discovered evidence impeaching Lynn Rominger's false, uncorroborated, and otherwise prejudicial "stalking" and "propensity" testimony against Petitioner at both trial and sentencing, Petitioner's sentence of 98 consecutive years in prison is excessive, disproportionate, and otherwise cruel and/or unusual in violation of the Constitution and laws of the United States and of the State of California.

///
//
/
///
//
/
///
//
/

68

**V.**

PRAYER FOR RELIEF

WHEREFORE, because he now has no other recognizable means of relief under the laws of the State of California, Petitioner Eric K'nAPP prays the United States District Court will:

1. Conduct a thorough and careful review of this entire matter.

2. Take notice of the ongoing State of Emergency within the California prison system, as well as the unconstitutional manner in which CDCr personnel at Salinas Valley State Prison have been and are interfering with Petitioner's ability to access the prison law library and adequately obtain research notes therefrom, all of which has been and is hindering Petitioner's efforts to most effectively represent himself in this matter pro se. (See, ante herein, at § III.N [p. 51]; see also, K'nAPP v. Tilton, et al. (N.D. Cal. 1/22/08) No. CV 08 0719, Claims 17-19.)

3. Upon taking notice of the above at #2, consider either:

    (a) granting Petitioner sufficient time to prepare and file separate Points, Authorities, and Exhibits for each of the six Grounds for Relief in this action; and/or

    (b) appointing counsel to at least assist Petitioner in researching, briefing, and/or filing separate Points, Authorities, and Exhibits for each of the six Grounds for Relief in this action.

4. Excuse any procedural default(s) that might be found to exist in this matter not only because any such procedural default "is due to an objective factor that is external to the petitioner and cannot be fairly attributed to him" (see, Coleman v. Thompson (1991) 501 U.S. 722, 753; Manning v. Foster (9th Cir. 2000) 224 F.3d 1129, 1133), but also because this petition raises claims of fundamental constitutional error such that a fundamental miscarriage of justice will result and Petitioner is presenting newly discovered evidence which "casts a vast shadow of doubt" on the reliability of his conviction to the extent that it is more likely than not that no reasonable juror would have convicted Petitioner in light of such newly discovered evidence. (See, e.g., Coleman v. Thompson 501 U.S. at 753; Schlup v. Delo (1995) 513 U.S. 298; Dretke v. Haley (2004) 541 U.S. 386; Murray v. Carrier (1986) 477 U.S. 478; Carriger v. Stewart (9th Cir. 1997) 132 F.3d 463.)

5. Conduct a fair and impartial evidentiary hearing;

6. Issue a Writ of Habeas Corpus; and/or

7. Grant or order whatever further relief is deemed most appropriate and just

69

1  in satisfactorily addressing and resolving this matter pursuant to and in
2  accordance with the Constitution and laws of the United States and of the
3  State of California.

4  DATED:  March 13 , 2008

5                              Respectfully submitted,

6
7                              Ê·ve  Œ L½ø
8                              ────────────────────────
                               ERIC CHARLES RODNEY K'nAPP
                               Petitioner, In Pro Per
9
10
11                                   **VI.**
12                              VERIFICATION

13  I, Eric Charles Rodney K'nAPP, swear under penalty of perjury that all facts
14  and information which I have asserted in the foregoing Petition for Writ of Habeas
15  Corpus and Brief in Support thereof are true and correct to the best of my
16  personal knowledge, including any I might have asserted on received information
17  and belief.

18      Executed this 13th day of March, 2008, at Soledad, California.

19
20                      Êve  Œ L½ø
                        ──────────────────────────
                        ERIC CHARLES RODNEY K'nAPP
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///
29  ///
30  ///
31  ///
32  ///
33  ///
34  ///
35  ///
36  ///
37  ///
38  ///

                              70

DECLARATION OF MAILING

Case Name: **K'nAPP v. Warden of Salinas Valley State Prison**

I, Eric K'nAPP, "Petitioner" in the above-titled action, declare under penalty of perjury that by doing the following in accordance with the Prison Mailbox Rule I mailed the accompanying:

**PETITION UNDER 28 U.S.C. FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY.**

1. I put the original and two copies of the above document inside an envelope addressed to the Clerk of the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, California 94102-3483;

2. I presented the above-addressed envelope to a Salinas Valley State Prison correctional officer, who took possession thereof for processing in accordance with prison mail procedures.

Executed this _16th_ day of March, 2008, at Soledad, California.

_Eric C R K'APP_
ERIC CHARLES RODNEY K'nAPP